RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0335p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TERRENCE JOHNSON, JIM HARRIS, JOSHUA
ROBERTS,

                *Plaintiffs-Appellants,*

      *v.*

PHIL BREDESEN, Governor of the State of
Tennessee; BROOK THOMPSON, Coordinator
of Elections; RILEY DARNELL, Secretary of
State of Tennesee; RICHARD HOLDEN,
Administrator of Elections for Shelby
County; KIM BUCKLEY, Administrator of
Elections for Madison County; RAY
BARRETT, Administrator of Elections for
Davidson County, in their official capacities,

                *Defendants-Appellees.*

No. 08-6377

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 08-00187—Thomas A. Wiseman, Jr., District Judge.

Decided and Filed: October 28, 2010

Before: MOORE and COOK, Circuit Judges; LUDINGTON, District Judge.[*]

_____

## COUNSEL

**ON BRIEF:** Nancy G. Abudu, Laughlin McDonald, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, INC., Atlanta, Georgia, Tricia Herzfeld, AMERICAN CIVIL LIBERTIES UNION OF TENNESSEE, Nashville, Tennessee, for Appellants. Janet M. Kleinfelter, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, James I. Pentecost, Jon A. York, PENTECOST & GLENN, PLLC, Jackson, Tennessee, John L. Ryder, HARRIS SHELTON HANOVER WALSH, PLLC, Memphis, Tennessee, Danny Presley, OFFICE OF THE SHELBY COUNTY ATTORNEY, Memphis, Tennessee, for Appellees.

_____

[*] The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

COOK, J., delivered the opinion of the court, in which LUDINGTON, D. J., joined.  MOORE, J. (pp. 17–55), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

COOK, Circuit Judge.  Plaintiffs Terrence Johnson, Jim Harris, and Joshua Roberts[1]—all Tennessee residents and convicted felons—filed a complaint alleging that, by conditioning restoration of their voting rights on payment of court-ordered victim restitution and child support obligations, Tennessee's voter re-enfranchisement statute violates the Equal Protection Clause of the United States Constitution, the Twenty-Fourth Amendment, and the Ex Post Facto and Privileges or Immunities Clauses of the United States and Tennessee Constitutions.  In a well-reasoned decision, the district court granted Defendants' motion for judgment on the pleadings, and Plaintiffs appealed.  Finding no error, we affirm.

I.

All three plaintiffs reside in various Tennessee counties: Johnson in Shelby County, Harris in Madison County, and Roberts in Davidson County.  A jury convicted Johnson of wire fraud in 1999, and the court sentenced him to a term of imprisonment and ordered him to pay $40,000 in restitution.  He completed his prison term, but remains unable to satisfy the restitution order.  In addition, he owes a significant amount (more than $1,000) in overdue child support payments.  Similarly, multiple felony convictions yielded prison sentences for Harris and Roberts, both of whom owed past-due child support obligations ($2,500 and $7,000, respectively) at the time they filed the complaint. Like Johnson, Harris and Roberts served their prison terms and are no longer on probation.  Harris has since paid his overdue child support, and thus faces no

_____

[1] As originally filed, the lawsuit's third plaintiff was an individual named Alexander Friedmann, who raised an additional due process claim pertinent only to himself.  With the district court's approval, the plaintiffs amended the complaint to add Joshua Roberts as a fourth plaintiff.  Friedmann eventually settled his dispute, but plaintiffs' counsel inadvertently included him (and excluded Roberts) in the notice of appeal.  Counsel sought to correct this error by moving to dismiss Friedmann from this appeal and substitute Roberts.  Defendants consent to this correction, and we now grant the motion.

impediment to applying for re-enfranchisement. He continues, however, to press a claim for nominal damages on account of any past constitutional harm.

The State of Tennessee, like many others, disenfranchises convicted felons, but provides them with a statutory procedure for regaining the franchise upon completion of their sentences and satisfaction of certain conditions. The re-enfranchisement statute at issue, Tennessee Code § 40-29-202, restores felons' eligibility "to apply for a voter registration card and have the right of suffrage restored" upon receipt of a pardon, discharge from custody after serving the maximum sentence imposed, or final discharge by the relevant county, state, or federal authority. The statute, however, carves out two exceptions to re-enfranchisement eligibility. It provides that:

> (b) . . . a person shall not be eligible to apply for a voter registration card and have the right of suffrage restored, unless the person has paid all restitution to the victim or victims of the offense ordered by the court as part of the sentence[, and]

> (c) . . . a person shall not be eligible to apply for a voter registration card and have the right of suffrage restored, unless the person is current in all child support obligations.

Tenn. Code Ann. § 40-29-202(b)–(c). The Tennessee legislature added these two conditions in 2006; before that, felons could apply for re-enfranchisement notwithstanding any outstanding restitution or child support obligations.

Having completed their prison and probation terms, Plaintiffs claim that they desire to vote in upcoming elections but remain ineligible to do so because of their unpaid restitution and child support obligations. They sued Defendants in the Middle District of Tennessee, challenging the constitutionality of the re-enfranchisement statute's restitution and child support provisions. Defendants sought judgment on the pleadings under Federal Rule of Civil Procedure 12(c), which the district court granted,

finding that Plaintiffs' constitutional challenges lacked merit.   Plaintiffs timely appealed.**2**

II.

On appeal, Plaintiffs claim that the district court erred in rejecting their challenges under the United States and Tennessee Constitutions.  We review the district court's grant of a Rule 12(c) motion for judgment on the pleadings using the same de novo standard applicable to a motion to dismiss under Rule 12(b)(6).  *Roger Miller Music, Inc. v. Sony/ATV Publ'g, LLC*, 477 F.3d 383, 389 (6th Cir. 2007).  "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment."  *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008) (quoting *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007)).

A.     Equal Protection

The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1. The Equal Protection Clause prevents states from making distinctions that (1) burden a fundamental right; (2) target a suspect class; or (3) intentionally treat one individual differently from others similarly situated without any rational basis.  *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  Plaintiffs argue that the district court erred by testing their equal protection challenge using the rational basis test, rather than strict scrutiny, because the re-enfranchisement statute: (1) burdens their fundamental right to vote; and (2) improperly discriminates against the indigent.

---

**2**Plaintiffs filed a motion asking this court to judicially notice two sets of responses to interrogatories.  We fail to see how either document fits within Federal Rule of Evidence 201, which permits judicial notice of an adjudicative fact so long as it is "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 476 (6th Cir. 2008) (quoting Fed. R. Evid. 201(b)).  Accordingly, we deny the motion.  We note, however, that even if considered, these documents would not affect our resolution of the merits.

Plaintiffs' arguments miss the mark. The state may, within the bounds of the Constitution, strip convicted felons of their voting rights. *Richardson v. Ramirez*, 418 U.S. 24, 54 (1974). Having lost their voting rights, Plaintiffs lack any fundamental interest to assert. *See Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) ("It is undisputed that a state may constitutionally disenfranchise convicted felons, and that the right of felons to vote is not fundamental." (citations omitted)). And contrary to Plaintiffs' other contention, wealth-based classifications do not discriminate against a suspect class. *See Papasan v. Allain*, 478 U.S. 265, 283–84 (1986); *Maher v. Roe*, 432 U.S. 464, 470–71 (1977). Accordingly, because Tennessee's re-enfranchisement law neither implicates a fundamental right nor targets a suspect class, the district court properly applied rational basis review, not strict scrutiny, to Plaintiffs' equal protection challenge. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973).

To survive rational basis scrutiny, the statute need only be "rationally related to legitimate government interests," *Doe v. Mich. Dep't of State Police*, 490 F.3d 491, 501 (6th Cir. 2007) (internal quotation marks and citation omitted), and "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)). Where rational basis review governs, we will not strike down a statute on equal protection grounds "unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance v. Bradley*, 440 U.S. 93, 97 (1979). "A 'plaintiff may demonstrate that the government action lacks a rational basis . . . either by negating every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.'" *Club Italia Soccer & Sports Org. v. Charter Twp. of Shelby, Mich.*, 470 F.3d 286, 298 (6th Cir.

2006) (alteration in original) (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)).

Defendants assert that the restitution and child-support-payment provisions in the re-enfranchisement statute advance legitimate interests of the state: protecting the ballot box from convicted felons who continue to break the law by failing to comply with court orders, encouraging payment of child support, and requiring felons to complete their entire sentences, including paying victim restitution. We find that the state's interests of encouraging payment of child support and compliance with court orders, and requiring felons to complete their entire sentences, including paying victim restitution, supply a rational basis for the challenged statutory provisions sufficient to pass constitutional muster. Certainly, Tennessee possesses valid interests in promoting payment of child support, requiring criminals to fulfill their sentences, and encouraging compliance with court orders. *See Jones v. Helms*, 452 U.S. 412, 423 (1981) ("There can be no question about the legitimacy of the purpose to cause parents to support their children."); *Carter v. Lynch*, 429 F.2d 154, 157–58 (4th Cir. 1970) (upholding state civil arrest and release statutes as legitimate legislative functions "well within the State's power to secure enforcement of the judgments of its courts"); *Blackhawk Mining Co. v. Andrus*, 711 F.2d 753, 757–58 (6th Cir. 1983) (upholding statute requiring prepayment of proposed penalty assessments against due process challenge where government had legitimate interest in preventing collection problems and ensuring compliance with the law). The challenged provisions in the re-enfranchisement law bear, at a minimum, a direct and rational relationship to the advancement of those interests, and therefore withstand rational basis scrutiny.

Although Plaintiffs, who urge the court to apply strict scrutiny, fail to satisfy *their* burden of negating any conceivable rational basis for the restitution and child support provisions, *Michael v. Ghee*, 498 F.3d 372, 379 (6th Cir. 2007), the dissent formulates new rational basis arguments in an attempt to carry this burden for them. The dissent's efforts similarly fail.

The dissent agrees that rational basis review governs, but insists that § 40-29-202(b)–(c) cannot survive constitutional scrutiny even under this highly deferential standard.  The dissent argues that "preconditioning suffrage on a payment that a person is unable to make is [not] in any rational way related to the government's interest in promoting that payment."  Dissent at 20.  But the statute is not aimed at encouraging the collection of payments from *indigent* felons, but from *all* felons.  The legislature may have been concerned, for instance, that a specific exemption for indigent felons would provide an incentive to conceal assets and would result in the state being unable to compel payments from some non-indigent felons.  That the state used a shotgun instead of a rifle to accomplish its legitimate end is of no moment under rational basis review.  *See E. Brooks Books, Inc. v. Shelby County, Tenn.*, 588 F.3d 360, 364 (6th Cir. 2009) ("[A] law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." (alternation in original) (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996))).  While the dissent would prefer that the state not discriminate on the basis of wealth when providing statutory benefits, this is an argument that must be resolved by the legislature, not this Court.

Resisting this traditional rational basis analysis, the dissent cites *Zablocki v. Redhail*, 434 U.S. 374, 389 (1978), and *Bearden v. Georgia*, 461 U.S. 660, 662 (1983), two cases where "the Supreme Court . . . rejected a similar 'collection device rationale.'" Dissent at 20.  Both cases are distinguishable.

In *Zablocki*, which concerned the fundamental right to marry, the Court applied *strict scrutiny* to strike down a state statute conditioning the ability to marry on the payment of child support obligations.  Although *Zablocki* found the state's asserted interest in encouraging child support payments legitimate, it found that the statute was not "closely tailored to effectuate only [that] interest[]," *Zablocki*, 434 U.S. at 388, in light of the existence of "numerous other means for exacting compliance with . . . obligations," *id*. at 389.  The dissent rightly notes that here, like *Zablocki*, other means (indeed, perhaps better means) exist for collecting restitution and child support

payments. But whereas strict scrutiny guided the Court's analysis in *Zablocki*, rational basis guides our review. Ultimately, this standard proves determinative because "[t]he fact that other means are better suited to the achievement of governmental ends . . . is of no moment under rational basis review." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 77 (2001).

Like *Zablocki*, *Bearden v. Georgia* also proves inapposite due to its heightened standard of review. In *Bearden*, the Court held that Georgia could not revoke an individual's probation for failure to pay a fine or restitution absent evidence and findings that he was somehow responsible for the failure. The revocation of probation at issue in *Bearden* implicated physical liberty and effectively "turned a fine into a prison sentence." *Bearden*, 461 U.S. at 674. Although the parties "debate[d] vigorously whether strict scrutiny or rational basis [was] the appropriate standard of review," *id*. at 665, the Court maintained that in that instance the issue could not be resolved by "pigeonhole analysis," but rather required "a careful inquiry into such factors as the nature of the individual interest affected, the extent to which it is affected, the rationality of the connection between legislative means and purpose, [and] the existence of alternative means for effectuating the purpose," *id*. at 666–67 (alteration in original) (quotation marks and citation omitted). Tennessee's re-enfranchisement conditions, by contrast, merely relate to the restoration of a civil right to which Plaintiffs have no legal claim, and invoke only rational basis review. *See Madison v. Washington*, 163 P.3d 757, 770 (Wash. 2007) (distinguishing *Bearden* and upholding, under rational basis review, a statute conditioning re-enfranchisement on completion of all terms of felons' sentences, including full payment of their financial legal obligations). With its differing standard of review, *Bearden* bears little on our analysis here.

Likewise inapposite are *Griffin v. Illinois*, 351 U.S. 12 (1956), *Williams v. Illinois*, 399 U.S. 235 (1970), and *James v. Strange*, 407 U.S. 128 (1972), three cases from the 1950s and 1970s that the dissent finds instructive regarding "the propriety of wealth-based distinctions." Dissent at 25. Each of these cases concerned fundamental interests subject to heightened scrutiny. Though the *Griffin* Court declined to specify

its review standard, its analysis focused on the importance of the right of access to the courts. *See Griffin*, 351 U.S. at 19 ("Thus to deny adequate review to the poor means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside."); *Robinson v. Bd. of Regents*, 475 F.2d 707, 710 (6th Cir. 1973) (explaining how the existence of a fundamental right "triggered the application of [strict scrutiny]" in *Griffin*). And while the *Williams* Court similarly failed to articulate a precise standard of review, the fact that the case involved the denial of an indigent defendant's physical liberty appeared dispositive. *See Williams*, 399 U.S. at 262–63 (Harlan, J., concurring) ("[T]he presumption of regularity that comes with legislative judgment is one that is not equally acceptable in all instances, nor is it blind to the nature of the interest affected. . . . [T]his Court will squint hard at any legislation that deprives an individual of his liberty—his right to remain free."). Indeed, *Williams* held only that "a State may not constitutionally imprison beyond the maximum duration fixed by statute a defendant who is financially unable to pay a fine," without even reaching "the question whether a State is precluded in any other circumstances from holding an indigent accountable for a fine by use of a penal sanction." *Williams*, 399 U.S. at 243–44. And though *Strange*'s text appeared to apply rational basis review, the Court, concerned about discriminatory garnishment of the wages with which a debtor "supports himself and his family," found that the admittedly "legitimate" interests of the state paled in comparison to "the hopes of indigents for self-sufficiency and self-respect." *Strange*, 407 U.S. at 135, 141–42; *see also Olson v. James*, 603 F.2d 150, 154 (10th Cir. 1979) ("[I]t was the failure of the statute to protect the wages and the intimate personal property of the defendant from seizure and its consequent discouraging of independence and self-sufficiency . . . that brought the Court to the conclusion that the provisions constituted a violation of the equal protection clause."). Plaintiffs here assert no comparable interest triggering a heightened standard of review, but, instead, the mere "statutory benefit" of re-enfranchisement. *Harvey v. Brewer*, 605 F.3d 1067, 1079 (9th Cir. 2010).

Over the years, the Court has propounded inconsistent iterations of the rational basis standard. In *United States Railroad Retirement Board v. Fritz,* the Court

acknowledged its usage of different rational basis formulations, referencing a collection of cases—including *Strange*—and noting that even "[t]he most arrogant legal scholar would not claim that all of these cases applied a uniform or consistent test under equal protection principles." 449 U.S. 166, 177 n.10 (1980). We believe that our application of the test aligns with this Circuit's and the Supreme Court's most recent pronouncements on the rationality standard, namely, that a "law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *E. Brooks Books, Inc. v. Shelby County*, 588 F.3d 360, 364 (6th Cir. 2009) (quoting *Romer v. Evans*, 517 U.S. 620, 632 (1996)).[3] Our application also aligns with various courts' applications of rational basis review to laws premising the restoration of the right to vote upon felons' completion of certain conditions. *See, e.g.*, *Harvey*, 605 F.3d 1067; *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010); *Owens v. Barnes*, 711 F.2d 25 (3d Cir. 1983); *Madison*, 163 P.3d 757. For example, in *Hayden v. Paterson*, the Second Circuit, though recognizing that "there remains some oddity in the laws in that those who have finished their prison terms, but are still on parole, are denied the right to vote while those with suspended sentences are not," denied the plaintiffs' equal protection challenge because "rational basis review allows legislatures to act incrementally and to pass laws that are over (and under) inclusive without violating the Fourteenth Amendment." 594 F.3d at 171.

Finally, the dissent advances an "additional reason" why it finds § 40-29-202(c) "constitutionally suspect," Dissent at 29, namely, that the child-support-payment condition fails to relate directly to the state's reason for stripping individuals of the franchise in the first place—i.e., the underlying felony conviction. The dissent culls this direct-relationship constitutional requirement from *Richardson v. Ramirez* and *Hunter*

---

[3]It is worth noting that Tennessee courts expressly take into account "ability to pay" when calculating restitution and child support awards. Tenn. Code Ann. § 40-35-304(d) ("In determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform."); *Ford v. Ford*, No. 01A01-9611-CV-00536, 1998 WL 730201, at *2 (Tenn. Ct. App. Oct. 21, 1998) ("Tennessee's child support guidelines establish a rebuttable presumption of a minimum acceptable amount of support based on the noncustodial parent's ability to pay.").

*v. Underwood*, 471 U.S. 222 (1985). But *Richardson* and *Hunter* instruct that the state's authority to disenfranchise derives from an individual's commission of a qualifying crime and do not, as the dissent suggests, speak to franchise return. *Richardson*, 418 U.S. at 54; *Hunter*, 471 U.S. at 233. Rather, well-settled equal protection principles provide that the statutory re-enfranchisement conditions need only further a legitimate government interest—not a legitimate government interest specifically tied to the state's authority for the initial disenfranchisement. *Vance*, 440 U.S. at 97 (finding that legislature's actions must qualify as irrational to fail rational basis review).

B.      Twenty-Fourth Amendment

The Twenty-Fourth Amendment proscribes any denial or abridgement of the right to vote for "failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. Passed in 1962 and ratified two years later, the Twenty-Fourth Amendment exists to combat the "disenfranchisement of the poor . . . ." *Harman v. Forssenius*, 380 U.S. 528, 539 (1965). Plaintiffs claim that the restitution and child-support-payment provisions amount to unlawful poll taxes because they condition the restoration of voting rights on monetary payments Plaintiffs are unable to make. This argument fails for several reasons.

First, and most fundamentally, the re-enfranchisement law at issue does not deny or abridge any rights; it only restores them. As convicted felons constitutionally stripped of their voting rights by virtue of their convictions, Plaintiffs possess no right to vote and, consequently, have no cognizable Twenty-Fourth Amendment claim. *Harvey*, 605 F.3d at 1080. The challenged provisions do not disenfranchise them or anyone else, poor or otherwise; Tennessee's indisputably constitutional disenfranchisement statute accomplished that. *See Richardson*, 418 U.S. at 54. The re-enfranchisement law does not condition the right to vote on payment of restitution or child support, but instead conditions the restoration of a felon's right to vote on such payment—a state regulatory arrangement the Twenty-Fourth Amendment says nothing about. *See Harvey*, 605 F.3d at 1080 (affirming dismissal of claim by disenfranchised felons that Arizona's disenfranchisement scheme violated the Twenty-Fourth Amendment by requiring the

payment of any fine or restitution before restoration of voting rights); *Howard v. Gilmore*, No. 99-2285, 2000 WL 203984, at *2 (4th Cir. Feb. 23, 2000) (per curiam) (affirming dismissal of claim by disenfranchised felon that $10 fee for initiating restoration of civil rights, including voting, constituted an unconstitutional poll tax in violation of the Twenty-Fourth Amendment because "it is not his right to vote upon which payment of a fee is being conditioned; rather, it is the restoration of his civil rights upon which the payment of a fee is being conditioned").

Second, even if the Twenty-Fourth Amendment applied to Tennessee's re-enfranchisement law, the provisions requiring payment of restitution and child support do not represent taxes on voting imposed by the state, and therefore do not violate the Amendment's terms. *See Coronado v. Napolitano*, No. CV-07-1089-PHX-SMM, 2008 WL 191987, at *5 (D. Ariz. Jan. 22, 2008) (rejecting Twenty-Fourth Amendment challenge to restitution payment requirement). Unlike poll taxes, restitution and child support represent legal financial obligations Plaintiffs themselves incurred. *See Harvey*, 605 F.3d at 1080 ("That restoration of [disenfranchised felons'] voting rights requires them to pay all debts owed under their criminal sentences does not transform their criminal fines into poll taxes."). By exercising its "power to fix qualifications," *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 668 (1966), Tennessee permissibly limits the vote to individuals without felony convictions, *Richardson*, 418 U.S. at 56, and lawfully conditions the restoration of voting rights on satisfaction of such court-ordered obligations that exist independently of the re-enfranchisement statute or any tax law violations. Thus, even if the Twenty-Fourth Amendment applies, Tennessee's re-enfranchisement statute does not violate it because the restitution and child-support-payment provisions fail to qualify as the sort of taxes the Amendment seeks to prohibit.

C.      Privileges or Immunities

Largely dormant since the Supreme Court's decision in the *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1872), significantly restricted its reach, *see Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002), the Privileges or Immunities Clause of the Fourteenth Amendment prohibits states from abridging the privileges or immunities of

national citizenship.  U.S. Const. amend. XIV, § 1.  As the district court correctly observed, no authority recognizes the right to vote in federal elections as a privilege or immunity of United States citizenship.  Indeed, dicta in several historical Supreme Court cases suggest the opposite.  *See Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 178 (1874); *Pope v. Williams*, 193 U.S. 621, 632 (1904), *amended by Dunn v. Blumstein*, 405 U.S. 330, 337 n.7 (1972).  But in any event, even if voting qualifies as a privilege or immunity of citizenship, Plaintiffs fail to state a claim because, under the Supreme Court's holding in *Richardson*, the Constitution authorizes the complete abrogation of felons' voting rights.  418 U.S. at 56.  Accordingly, we find that the district court correctly rejected Plaintiffs' privileges or immunities argument because adopting it would require the absurd holding that § 1 of the Fourteenth Amendment proscribes the very same practice the Supreme Court expressly deemed permissible under § 2 of that same amendment.

D.     Tennessee Ex Post Facto

In the district court, Plaintiffs challenged the restitution and child-support-payment provisions under the Ex Post Facto Clauses of both the U.S. and Tennessee Constitutions, which prohibit the enactment of any law that imposes punishment for an act after its commission, or imposes additional punishment to that previously prescribed. *Weaver v. Graham*, 450 U.S. 24, 28 (1981); U.S. Const. art. I, § 10; Tenn. Const. art. I, § 11.  The district court rejected both claims, and Plaintiffs appeal only the rejection of their Tennessee constitutional claim.

Analysis of ex post facto claims involves a two-part inquiry.  First, we ask whether the challenged law constitutes a civil, regulatory measure, or, instead, a punitive one. *Smith v. Doe*, 538 U.S. 84, 92 (2003).  To answer this question, we look to "whether the legislature, in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." *Hudson v. United States*, 522 U.S. 93, 99 (1997) (internal quotation marks and citation omitted).  If we answer "punitive," then the inquiry ends with a determination that the law violates the Ex Post Facto Clause. *See Smith*, 538 U.S. at 92–93.  Second, even if the legislature intended to

classify the law as civil, we still must ask whether "the statutory scheme was so punitive either in purpose or effect as to negate that intention." *United States v. Ward*, 448 U.S. 242, 248–49 (1980). The non-exclusive and non-dispositive seven-factor analysis developed in *Kennedy v. Mendoza-Martinez*, guides this inquiry. 372 U.S. 144, 168–69 (1963). "'[O]nly the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100 (quoting *Ward*, 448 U.S. at 249).

When it enacted § 40-29-202(b)–(c), the Tennessee legislature did not explicitly disclose either a civil or punitive intention. Although it situated the challenged provisions in the "Criminal Procedure" volume of the Tennessee Code, the specific chapter bears the title "Restoration of Citizenship," which serves a civil, non-punitive purpose—namely, regulating the process through which felons may regain the right to vote. Indeed, the law's statutory neighbor, § 40-29-203, also in the "Restoration of Citizenship" chapter, establishes a procedure for a felon's application for and the state's issuance of a voter registration card—a process obviously unrelated to punishment. That the legislature chose to put § 40-29-202 in the "Criminal Procedure" title makes it no more punitive than other chapters found in the same title, such as chapter 14, which establishes procedures for the appointment of counsel for indigents; chapter 27, which covers procedures for pardons; or chapter 30, which entitles convicts to request DNA analysis of evidence. In other words, although the statute here, like others located in the "Criminal Procedure" title, relates to the criminal justice system, its purpose may nevertheless be non-punitive. Finding no evidence that the legislature enacted the challenged provisions with punitive intentions, we turn to the second part of the ex post facto inquiry: examining whether the statute's purpose or effect negated the legislature's non-punitive intentions.

Our examination—using the applicable *Mendoza-Martinez* factors—finds no contradiction of the legislative non-punitive intent in the statute's purpose or effect. Nothing in the record suggests a historically punitive characterization of re-enfranchisement schemes; indeed, Plaintiffs fail to cite a case supporting such treatment.

Nor does the statute promote the traditional aims of punishment, since it only restores rights originally stripped by the disenfranchisement statute.  Significantly, Tennessee child support law, which conditions payment on the payor's ability to earn a living so as to *avoid* imposing a penal obligation, exists to protect children; and restitution payments aim to restore crime victims to the position they would have been in had the crime not occurred—not to punish the perpetrator.  Moreover, the law resists classification as one imposing an affirmative disability—if Plaintiffs suffer from an affirmative disability, the disenfranchisement statute must take the blame.  And, as discussed in the equal protection analysis, the restitution and child-support-payment provisions bear a rational connection to legitimate non-punitive interests of the state, and are not excessive with regard to those purposes.  *See Mendoza-Martinez*, 372 U.S. at 168–69 (discussing factors).

Moreover, in *Trop v. Dulles*, the Supreme Court expressly stated that felon disenfranchisement laws serve a regulatory, non-penal purpose.  356 U.S. 86, 96–97 (1958).  Accordingly, as a matter of federal law, disenfranchisement statutes do not violate the Ex Post Facto Clause of the U.S. Constitution.  It necessarily follows that, if the laws that strip convicted felons of their voting rights in the first instance fail to qualify as punitive, then those that subject restoration to the fulfillment of certain conditions do not either.  Like the Supreme Court's disenfranchisement example in *Trop*, Tennessee's re-enfranchisement statute serves "to designate a reasonable ground of eligibility for voting," and thus qualifies "as a nonpenal exercise of the power to regulate the franchise."  *See id*.  Plaintiffs raise no challenge to this analysis; in fact, they declined to appeal the district court's ruling on their federal ex post facto claim.  They argue, however, that the re-enfranchisement law deserves precisely the opposite treatment under Tennessee's Ex Post Facto Clause because the Tennessee Supreme Court recently held that "[l]aws disenfranchising convicted felons are penal in nature." *May v. Carlton*, 245 S.W.3d 340, 349 (Tenn. 2008); *see also Gaskin v. Collins*, 661 S.W.2d 865, 868 (Tenn. 1983).

Plaintiffs mistakenly rely on *May*. *May* held that for purposes of Tennessee's habeas corpus statute, illegal disenfranchisement is a "restraint on liberty." *May*, 245 S.W.3d at 342 (internal quotation marks omitted). The court then granted the petitioner relief under Tennessee's habeas corpus statute because the law at issue retroactively labeled petitioner's crime "infamous" and thereby disenfranchised him—which is impermissible under Tennessee law. *Id.* at 349 (citing *Gaskin*, 661 S.W.2d at 867). Other than citing *Gaskin*, *May* does not explain why this result is impermissible. *See id.* *Gaskin*, however, did not hold that laws retroactively disenfranchising felons are impermissible because they violate the Ex Post Facto Clause (Article I, Section 11) of the Tennessee Constitution. Rather, *Gaskin* held such laws to be impermissible because they violate Article I, Section 5 of the Tennessee Constitution, a section specifically related to elections and prompted by Tennessee's civil war history. *Gaskin*, 661 S.W.2d at 866–68. To be sure, the *May* petitioner argued laws retroactively disenfranchising felons violate Tennessee's Ex Post Facto Clause (in addition to Article I, Section 5). *See May*, 245 S.W.3d at 342. Yet, this is not the holding of *May* or *Gaskin*. *Gaskin* therefore provides no support for *May*'s observation that "[l]aws disenfranchising convicted felons are penal in nature." *May*, 245 S.W.3d at 349. Neither is the "penal in nature" statement supported by other law or logic in the opinion. The "penal in nature" statement is pure dicta, insufficient to compel the conclusion that *either* laws retroactively disenfranchising felons *or* laws regulating re-enfranchisement violate the Ex Post Facto Clause of the Tennessee Constitution.

III.

For these reasons, we affirm.

————————————

**DISSENT**

————————————

KAREN NELSON MOORE, Circuit Judge, dissenting.  A state under current law may curtail a felon's right to vote, or even forever deny it, but once a state enacts a process by which a felon may regain suffrage, that process must comport with the demands of the Constitution.  Contrary to the majority's conclusion, I would hold that Tennessee Code § 40-29-202(b) and (c) violate the Equal Protection Clause of the U.S. Constitution and the Ex Post Facto Clause of the Tennessee Constitution.  I further believe that the Plaintiffs have alleged sufficient factual matter to state a claim for relief under the Twenty-Fourth Amendment to the U.S. Constitution such that dismissal on the pleadings was improper.  For the following reasons, I must respectfully dissent.

Tennessee Code § 2-19-143 and § 40-20-112 disenfranchise all persons who have been convicted of "infamous" crimes, i.e., felonies.  Those felons denied the right to vote are "eligible to apply for a voter registration card and have the right of suffrage restored" if they receive a pardon, are discharged from custody after serving the maximum sentence imposed, or are granted a final discharge from supervision by the relevant county, state, or federal authority.  Tenn. Code Ann. § 40-29-202(a)(1)–(3) (2006).  Notwithstanding this provision, however, there are two pecuniary preconditions to reenfranchisement: "[A] person shall not be eligible to apply for a voter registration card and have the right of suffrage restored, unless the person has paid all restitution to the victim or victims of the offense ordered by the court as part of the sentence," *id.* § 40-29-202(b), and "unless the person is current in all child support obligations," *id.* § 40-29-202(c).  Prior to 2006, felons adjudged to have committed infamous crimes were eligible to vote upon the completion of their sentences despite any outstanding financial obligations.

In the instant case, the Plaintiffs are individuals who have completed the imprisonment associated with the felonies for which the State was authorized to abridge their right to vote.  Yet because of their *inability* to pay outstanding restitution and/or

child-support arrears, the State continues to deny them the right of suffrage to which they otherwise would be entitled automatically were the law the same now as it was at the time of their convictions and initial disenfranchisement.  It is indisputable that the Plaintiffs are now unable to access the ballot box simply because they are too poor to pay.

## I.

### A.  Equal-Protection Claim

The Equal Protection Clause of the Fourteenth Amendment prohibits states from making distinctions that "burden a fundamental right, target a suspect class, or intentionally treat one differently from others similarly situated without any rational basis for the difference." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005).  The precise level of scrutiny that a court will provide a challenged provision "depend[s] upon the interest affected or the classification involved." *Dunn v. Blumstein*, 405 U.S. 330, 335 (1972).  Those laws that burden a fundamental right or target a suspect class will be "subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (internal quotation marks omitted).  A law that "neither burdens a fundamental right nor targets a suspect class" must "bear[] a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).  "[T]he Equal Protection Clause is satisfied as long as there is a plausible policy reason for the classification . . . and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational." *Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992) (internal citations omitted); *see City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 446 (1985) ("The State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational.").

I agree with the majority as to some components of its equal-protection analysis. I agree that the Plaintiffs in this case have no fundamental right to vote under existing case law. *See Wesley v. Collins*, 791 F.2d 1255, 1261 (6th Cir. 1986) (citing, among

other cases, *Richardson v. Ramirez*, 418 U.S. 24, 26 (1974)).  I also agree that the Plaintiffs' membership in "a class of less wealthy individuals is not a suspect class" under prevailing precedent.  *Molina-Crespo v. U.S. Merit Sys. Prot. Bd.*, 547 F.3d 651, 660 (6th Cir. 2008) (citing *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29 (1973)).  Given these two conclusions, I must also agree that, because the Tennessee provisions neither burden a fundamental right nor discriminate against a suspect class, the Plaintiffs bear the burden to show that § 40-29-202(b) and (c) bear no rational relationship to any legitimate government end.  *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993).

Where my agreement with the majority ends, however, is with its conclusion that the Tennessee provision requiring full payment of all outstanding child-support arrears prior to the restoration of suffrage—regardless of whether the individual is able to pay—satisfies this rational-basis inquiry.  Although "[o]nly a handful of provisions have been invalidated for failing rational basis review," *Craigmiles v. Giles*, 312 F.3d 220, 225 (6th Cir. 2002), the absence of any policy justification for the distinction in the instant case, as well as Supreme Court precedent addressing the propriety of provisions that discriminate on the basis of wealth, compel the conclusion that this is one of those instances.  Simply put, Tennessee has no rational basis for denying voting rights to only those felons with outstanding financial obligations, despite their inability to pay.

### 1. Section 40-29-202(b) and (c) Are Not Rationally Related to Any Legitimate Interest

The statutory provisions at issue in the instant case, § 40-29-202(b) and (c), preclude individuals, like the Plaintiffs, who are unable to satisfy all outstanding restitution orders and child-support arrears from regaining the franchise.  The majority credits Tennessee's purported justifications for the provision, specifically concluding that § 40-29-202(b) and (c) are constitutionally sound because Tennessee has a legitimate interest in "encouraging payment of child support," "encouraging compliance with court orders," "protecting the ballot box from convicted felons who continue to break the law by failing to comply with court orders," and "requiring felons to complete" the financial obligations associated with their sentences.  Maj. Op. at 6.  I cannot agree

that the provision restoring the franchise to only those felons who are affluent enough to satisfy their child-support arrears is rationally related to a legitimate government objective, and I believe that no policy reason supports the distinction in the instant case.

With respect to the first two policy justifications set forth by the majority, although Tennessee may seek to encourage the payment of child support, the payment of restitution, and compliance with court orders by conditioning the restoration of suffrage on the respective payments, this explanation fails to consider that § 40-29-202(b) and (c) are not restricted to just those persons who are unwilling to pay their arrears or restitution or comply with their court orders; instead, it includes individuals like the Plaintiffs who are simply *unable* to do so. Even acknowledging that Tennessee's proffered justifications for the law implicate legitimate state interests, I fail to see how preconditioning suffrage on a payment that a person is unable to make is in any rational way related to the government's interest in promoting that payment.

In fact, the Supreme Court has rejected a similar "collection device rationale" on at least two occasions. In *Zablocki v. Redhail*, for example, the Court confronted the constitutionality of a statute that required an applicant for a marriage license who had children from a previous relationship to "show[] that he ha[d] satisfied his court-determined support obligations to the prior children and that those children [would] not become public charges." *Zablocki v. Redhail*, 434 U.S. 374, 389 (1978). At oral argument, the State in *Zablocki* suggested that the statute was justified because it "provide[d] [an] incentive for the applicant to make support payments to his children." *Id.* The Court, however, rejected this rationale, stated that it could not "justify the statute's broad infringement on the right to marry" and emphasized that "with respect to individuals who are *unable* to meet the statutory requirements, the statute merely prevents the applicant from getting married, without delivering any money at all into the hands of the applicant's prior children." *Id.* (emphasis added).

Similarly, in *Bearden v. Georgia*, the Supreme Court held that the State of Georgia was not entitled to revoke automatically an individual's probation because of the failure to pay the fines and restitution associated with the sentence without some

determination that the individual had not made bona fide efforts to pay. *Bearden v. Georgia*, 461 U.S. 660, 662 (1983). The Court rejected the State's claim that "revoking probation further[ed] its interest in ensuring that restitution be paid to the victims of crime" on the grounds that "[r]evoking the probation of someone who through no fault of his own is unable to make restitution will not make restitution suddenly forthcoming." *Id.* at 670; *see id.* ("A rule that imprisonment may befall the probationer *who fails to make sufficient bona fide efforts* to pay restitution may indeed spur probationers to try hard to pay, thereby increasing the number of probationers who make restitution." (emphasis added)). Similarly, the Tennessee statute here is "ludicrously ineffectual" at encouraging the payment of child-support arrears as it makes no accommodation for individuals like the Plaintiffs who simply cannot pay despite a willingness to do so. *Plyler v. Doe*, 457 U.S. 202, 228 (1982) (internal quotation marks omitted).

Moreover, "[t]he Supreme Court, employing rational basis review, has been suspicious of a legislature's circuitous path to legitimate ends when a direct path is available." *Craigmiles*, 312 F.3d at 227 (citing *City of Cleburne*, 473 U.S. at 449)). And in the instant case, "regardless of the [Plaintiffs'] ability . . . to meet the statutory requirements, the State already has numerous other means for exacting compliance with . . . obligations," such as wage garnishment, which are "means that are at least as effective as the instant statute's and yet do not impinge upon" the Plaintiffs' attempt to regain the right to vote. *Zablocki*, 434 U.S. at 389; *see also id.* at 389–90 ("[C]ourt-determined support obligations may be enforced directly via wage assignments, civil contempt proceedings, and criminal penalties."). The Supreme Court has made plain that the availability of alternative enforcement mechanisms is relevant in rational-basis review because it exposes the spuriousness of the asserted interest. For example, in *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528 (1973), the Court invalidated as irrational a law that distinguished between related and unrelated individuals for purposes of determining food-stamp eligibility. Although the government asserted that the distinction was intended to deter fraud, which was a legitimate justification, the challenged statute contained other provisions dealing explicitly with fraud prevention. Striking down the statutory provision as a violation of equal protection, the Court stated

that the inclusion in the statute of these alternative provisions to deter fraud "necessarily casts considerable doubt upon the proposition that the [challenged provision] could rationally have been intended to prevent those very same abuses." *Id.* at 537 ("[I]n practical effect, the challenged classification simply does not operate so as rationally to further the prevention of fraud.").

In short, I find entirely unconvincing the majority's conclusion that § 40-29-202(b) and (c) constitute a rational way to encourage Tennessee's legitimate interest in the collection of outstanding financial obligations or encourage compliance with court orders imposing such obligations. The attempt to incentivize payments that an individual is simply incapable of making by linking those payments to the right to vote, particularly when there are other collection methods available, advances no purpose and embodies nothing more than an attempt to exercise unbridled power over a clearly powerless group, which is not a legitimate state interest. *See City of Cleburne*, 473 U.S. at 446–47.

The next proffered justification for the statute—that the ballot box needs "protect[ion]" from those who "continue to break the law by failing to comply with court orders," Maj. Op. at 6—is likewise unconvincing and is belied by the Tennessee statutes governing the non-payment of child support in the case of subsection (c). Pursuant to Tennessee Code § 39-15-101, the mere inability to pay child support is not a crime. *See* Tenn. Code Ann. § 39-15-101(a) ("A person commits the crime of nonsupport . . . [when that person] fails to provide support which that person is *able to provide* and knows the person has a duty to provide . . . ." (emphasis added)). And the failure to pay when able, absent certain aggravating circumstances, amounts to only a misdemeanor, *id.* § 39-15-101(a), (e), which is a criminal act that on its own would be an insufficient basis upon which to deny an individual suffrage. *See id.* § 40-20-112 ("Upon conviction for any *felony*, it shall be the judgment of the court that the defendant be infamous and be immediately disqualified from exercising the right of suffrage."); Tenn. Const. art. 1, § 5 (authorizing disenfranchisement for felons "upon a conviction by a jury of some infamous crime"); *cf. Shepard v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978) ("A state

properly has an interest in excluding from the franchise persons who have manifested a fundamental antipathy to the criminal laws of the state or of the nation by violating those laws sufficiently important to be classed as felonies.").  Moreover, there has been no allegation that any of the Plaintiffs has been convicted of or pleaded guilty to the failure to pay child support such that they have, in fact, been adjudicated of "break[ing] the law," and the statute is certainly not limited to such individuals.

Additionally, the assertion that § 40-29-202(b) and (c) are justified on the grounds the ballot box needs protection from felons such as the Plaintiffs, who are *unable* to make the payments that the statute requires, amounts to nothing "more than a naked assertion that [a felon's] poverty by itself," *Bearden*, 461 U.S. at 671, is a sufficient reason to disqualify the felon from regaining the right to participate in the exercise of democracy.  This, however, cannot be a legitimate justification for § 40-29-202(b) and (c), as the Supreme Court's voting-rights jurisprudence counsels that voting qualifications based on an individual's ability to pay are per se unconstitutional under the Equal Protection Clause.  *See Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 666 (1966) (invalidating a Virginia statute that assessed a poll tax in state elections on the grounds "that a State violates the Equal Protection Clause of the Fourteenth Amendment *whenever* it makes the affluence of the voter or payment of any fee an electoral standard."  (emphasis added)); *cf. Richardson*, 418 U.S. at 53 ("'Residence requirements, age, previous criminal record are obvious examples indicating factors which a State may take into consideration in determining the qualifications of voters.'" (quoting *Lassiter v. Northhampton County Bd. of Elections*, 360 U.S. 45, 51 (1959) (internal citation omitted)).

The effective result of the State's attempt to justify § 40-29-202(b) and (c) as a legitimate way to limit access to the ballot box is that the State has injected wealth as a determinative factor in an arena where it simply has no place.  *See Bynum v. Conn. Comm'n on Forfeited Rights*, 410 F.2d 173, 176–77 (2d Cir. 1969).  "Wealth, like race, creed, or color, is not germane to one's ability to participate intelligently in the electoral process," and wealth as a measure of a voter's qualification is nothing more than a

"capricious or irrelevant factor" that cannot withstand constitutional scrutiny. *Harper*, 383 U.S. at 668; *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, __, 128 S. Ct. 1610, 1616 (2008) ("Although the State's justification for the tax [in *Harper*] was rational, it was invidious because it was irrelevant to the voter's qualifications."); *M.L.B. v. S.L.J.*, 519 U.S. 102, 123–24 (1996) ("States are not forced by the Constitution to adjust all tolls to account for disparity in material circumstances. But our cases solidly establish two exceptions to that general rule. The basic right to participate in political processes as voters . . . cannot be limited to those who can pay for a license." (internal quotation marks and citation omitted)).

By providing for the automatic restoration of the franchise to those who have completed their sentences under § 40-29-202(a), Tennessee ceased to rely on the felon's participation in criminal activity as its basis for withholding the right to vote. Instead, the State deemed those felons eligible under subsection (a) of § 40-29-202 just as fit to participate in elections on equal terms as other qualified voters subject to one condition—the payment of a particular financial obligation, regardless of whether the individual can make that payment. Because the Plaintiffs are otherwise eligible for the automatic restoration of the right to vote but are prevented from attaining that right because of their inability to pay a particular sum, the Tennessee statute effectively sets affluence as a voting qualification and is plainly irrational.

In sum, "Tennessee's justifications . . . come close to striking [me] with the force of a five-week-old, unrefrigerated dead fish," which this court has stated is "a level of pungence almost required to invalidate a statute under rational basis review." *Craigmiles*, 312 F.3d at 225 (internal quotation marks and citations omitted). And I simply cannot conjure any rational basis that Tennessee would have for distinguishing between those felons who have outstanding obligations that they are unable to meet and those who do not in determining who is entitled to regain the franchise. No rational purpose underlies this disparate treatment.

**2. Supreme Court Jurisprudence Regarding the Propriety of Wealth-Based Distinctions Supports the Conclusion that the Provision is Irrational**

In addition to the fact that no proffered or conceivable policy reason can justify § 40-29-202(b)'s and (c)'s restrictions as to the Plaintiffs in the instant case, the Supreme Court's jurisprudence regarding the propriety of wealth-based distinctions further supports my conclusion that the statute differentiates between groups in a manner that is not rationally related to a legitimate interest. Because the statute distinguishes between those who owe a particular obligation and those who do not in determining whether an individual is worthy of the right to vote—regardless of whether an individual is able to pay—it is indisputable that the statute distinguishes among felons seeking reenfranchisement on the basis of wealth. Although the Supreme Court has declined to deem less-wealthy individuals members of a suspect class, the Court has recognized repeatedly that in some instances wealth-based distinctions or classifications are the result of prejudice rather than reason and cannot be constitutionally countenanced. Such is the case here.

To determine whether the distinction among felons based on their wealth in the instant case is rational and withstands constitutional scrutiny, *Griffin v. Illinois*, 351 U.S. 12 (1956), *Williams v. Illinois*, 399 U.S. 235 (1970), and *James v. Strange*, 407 U.S. 128 (1972), are instructive. In *Griffin*, the Supreme Court invalidated an Illinois law that required defendants who wished to appeal their convictions to purchase a copy of their trial transcripts. The Court determined that although "a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all[,] . . . a State that does grant appellate review [may not] do so in a way that discriminates against some convicted defendants on account of their poverty." *Griffin*, 351 U.S. at 18 (plurality opinion); *see id.* at 21–22 (Frankfurter, concurring). The analogy to the instant case is striking. Even though under current law the Plaintiffs no longer have a fundamental right to vote and Tennessee may deprive felons of the ability to vote indefinitely, when Tennessee decided to authorize reenfranchisement, the state was prohibited from setting conditions on that reenfranchisement that discriminated against

those otherwise-eligible individuals solely on the basis of their ability to pay a particular sum. *Bynum*, 410 F.2d at 176–77; *cf. M.L.B.*, 519 U.S. at 111 ("'This Court has never held that the States are required to establish avenues of appellate review, but . . . once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts.'" (quoting *Rinaldi v. Yeager*, 384 U.S. 305, 310 (1966))). The Tennessee statute plainly "discriminates against some convicted [felons] on account of their poverty," *Griffin*, 351 U.S. at 18 (plurality opinion), precluding the reattainment of the franchise solely on the basis of an individual's wealth and thereby contravening *Griffin*.

The Supreme Court's decision in *Williams* likewise indicates that the Tennessee provision cannot withstand even rational-basis scrutiny. In *Williams*, the Supreme Court invalidated a law that required indigent prisoners to serve time beyond their maximum sentences to work off their fines and court costs if the prisoners were unable to pay these financial obligations outright. *Williams*, 399 U.S. at 236, 241. The state contended that it had an "interest in the collection of revenues" and that the "'work off' system" was a "rational means of implementing that policy." *Id.* at 238. Although the Court recognized the State's interest to be "substantial and legitimate," *id.*, it concluded that when an individual's imprisonment exceeded the "maximum period fixed by the statute," and when the additional term of imprisonment "result[ed] directly from an involuntary nonpayment of a fine or court costs," the statute constituted "an impermissible discrimination that rest[ed] on ability to pay." *Id.* at 240–41. As with voting qualifications, the Court determined that the state had "wide latitude in fixing the punishment for state crimes," *id.* at 241, but "once the State has defined the outer limits of incarceration necessary to satisfy its penological interests and policies, it may not then subject a certain class of convicted defendants to a period of imprisonment beyond the statutory maximum solely by reason of their indigency," *id.* at 241–42.

Again, the analogy to the instant case is striking. Here, Tennessee set the outer limits of its felon-disenfranchisement scheme in § 40-29-202(a) by providing for the automatic restoration of suffrage for those who had completed their terms of

imprisonment or received a pardon. Tennessee then proceeded to subject a certain class of felons to an extended period of disenfranchisement beyond that limit solely because of those individuals' failure (and, in the case of the Plaintiffs, inability) to pay a sum of money. This condition leads to the denial of the ability to regain a fundamental right—the right to vote—akin to the right to freedom denied in *Williams*. Thus, while the interest of the State in collecting child support may be "legitimate" or even "substantial," *Williams*, 399 U.S. at 238, it is not rational to achieve that interest in a manner that discriminates against particular felons on the basis of their wealth.[1]

The conclusion that § 40-29-202(b) and (c) result in a wealth-based distinction that is not rationally related to a legitimate government objective is underscored by *James v. Strange*, 407 U.S. 128 (1972). In *Strange*, the Supreme Court unanimously invalidated under rational-basis review a Kansas recoupment statute that operated to treat indigent defendant debtors differently from other debtors. The statute appeared neutral on its face, but a close examination of the provision made clear that it "strip[ped] from indigent defendants" who were attempting to repay the debt accrued from their appointment of counsel "the array of protective exemptions Kansas had erected for other civil judgment debtors." *Id.* at 135. As in *Williams*, the Court "recognize[d] that state recoupment statutes may betoken legitimate state interests," but it emphasized that "these interests are not thwarted by requiring more even treatment of indigent criminal defendants with other classes of debtors." *Id.* at 141. And the Court held that the recoupment statute "embodie[d] elements of punitiveness and discrimination[,] which violate[d] the rights of citizens to equal treatment under the law." *Id.* at 142. Here, too, there is no legitimate policy reason for Tennessee to treat felons who have outstanding obligations and are unable to pay any differently from those who owe no financial obligation when it comes to providing for their automatic reenfranchisement.

---

[1]The majority's second assertion, that *Griffin* and *Williams* are inapposite because they "concerned fundamental interests subject to heightened scrutiny," Maj. Op. at 8, is also without merit. *Griffin* and *Williams* were, in fact, decided under rational-basis review, and the Court never classified the rights at issue as "fundamental." *See, e.g.*, *Bell v. Hongisto*, 501 F.2d 346, 353 (9th Cir. 1974) ("*Griffin* . . . , although recognizing the importance of adequate review of a criminal conviction, [did] not expressly call it a 'fundamental interest,' nor is it clear a strict standard of review was applied."). More importantly, however, in the years since *Griffin*, as I discuss *infra*, despite cabining the decisions on other grounds, the Supreme Court has never indicated that this line of cases applied anything other than rational-basis review.

Moreover, there is no question that the instant case falls within the purview of the above-mentioned Supreme Court precedents addressing the rationality of wealth-based distinctions. The Supreme Court made this plain in *San Antonio Independent School District v. Rodriguez*, when it stated that *Griffin*, *Williams*, and their progeny are controlling when plaintiffs share the following "two distinguishing characteristics": first, "because of their impecunity they [are] completely unable to pay for some desired benefit," and second, "as a consequence [of their impecunity], they sustain[] an absolute deprivation of a meaningful opportunity to enjoy that benefit." *San Antonio Indep. Sch. Dist.*, 411 U.S. at 20. The Plaintiffs in the instant case are unable to pay their financial obligations, which is a prerequisite to obtaining the reinfranchisement benefit that they seek, and given that Tennessee otherwise provides for the automatic restoration of the right of suffrage upon the satisfaction of these sums, it is as a consequence of their indigency that they suffer an absolute deprivation of their right to vote.[2] *See also id.* at 20–22 (discussing cases where the "class discriminated against" satisfied the two criteria); *M.L.B.*, 519 U.S. at 127 ("Sanctions of the *Williams* genre . . . are wholly contingent on one's ability to pay, and thus visit different consequences on two categories of persons; they apply to all indigents and do not reach anyone outside that class." (internal quotation marks and citation omitted)).

Furthermore, to the extent that the Supreme Court has limited *Griffin* and its progeny to those legislative classifications where the government retains a "legal or a practical monopoly" over the benefit that is the concern of the legislation, *Kadrmas v. Dickinson Pub. Schs.*, 487 U.S. 450, 460 (1988), the instant case falls within that limitation. Like access to the courts, the Plaintiffs have no choice but to engage with the State of Tennessee in seeking the restoration of the right to vote. There is simply "no alternative to that process," *id.*, other than to forgo seeking reenfranchisement altogether. In sum, Tennessee has conditioned the ability of the Plaintiffs to regain their right to vote

[2]Notwithstanding the fact that Tennessee initially sets a payment schedule in accordance with a parent's financial means when the obligation first attaches, the fact that the financial obligation was attainable at the time that it was fixed says nothing about whether a parent can meet the obligation (and any arrears) at present. The key factor is that the Plaintiffs are now responsible for a sum of money that they cannot pay. The statutory reenfranchisement scheme thus does not accommodate the Plaintiffs' inability to pay.

on their payment of legal financial obligations, notwithstanding the fact that they cannot pay, thereby codifying a wealth-based distinction that has no rational relationship to a legitimate State objective. Under Supreme Court precedent, § 40-29-202(b) and (c) cannot withstand rational-basis review.

> **3. Supreme Court Disenfranchisement Jurisprudence Supports a Conclusion that § 40-29-202(c) Is Unconstitutional Because It Is Neither Part of the Criminal Sentence for the Felony for Which the State Constitutionally Denied Suffrage Nor Is it Otherwise Related to the Fact of Conviction.**

Apart from the reasons set forth above, which are grounded in traditional rational-basis review, I believe it necessary to highlight one additional reason that subsection (c) of § 40-29-202 is constitutionally suspect. Unlike the several felon reinfranchisement cases that courts have confronted across the Circuits, under § 40-29-202(c), Tennessee has decided to impose on those felons seeking reinfranchisement an obligation—the payment of child-support arrears—that is entirely divorced from the reason for which Tennessee was empowered to deny them the franchise in the first place. Although the Supreme Court has never addressed specifically the bounds of felon reenfranchisement, the Court's cases involving felon disenfranchisement highlight the very limited basis upon which States are empowered to deny absolutely the right of suffrage and counsel against the majority's holding that § 40-29-202(c) is constitutionally sound.

The Supreme Court first upheld the constitutionality of felon-disenfranchisement statutes in *Richardson v. Ramirez.* In that case, the Court determined that an "affirmative sanction" for felon-disenfranchisement existed in § 2 of the Fourteenth Amendment, *Richardson*, 418 U.S. at 54–55, which explicitly linked permissible disenfranchisement to an individual's "'participation in rebellion, or other crime,'" *id.* at 42–43 (quoting U.S. Const. amend. XIV, § 2). Despite holding that a state could constitutionally disenfranchise felons, however, the Court made plain that disenfranchisement laws are not insulated completely from constitutional challenge by remanding the case for the state court to determine whether "a total lack of uniformity

in county election officials' enforcement of the challenged [felon disenfranchisement provision] . . . work[ed] a separate denial of equal protection." *Id.* at 56; *see also Owens v. Barnes*, 711 F.2d 25, 26–27 (3d Cir. 1983) ("It has not been seriously contended that *Richardson* precludes any equal protection analysis when the state legislates regarding the voting rights of felons."). In *Hunter v. Underwood*, the Court further clarified the boundaries of the states' disenfranchisement power, stating again that such laws are not insulated completely from challenge under the Equal Protection Clause. Exemplifying this principle, the Court invalidated a provision in the Alabama State Constitution that disenfranchised individuals who had committed crimes of moral turpitude and that the Legislature had enacted with an intent to discriminate against a suspect class. *Hunter v. Underwood*, 471 U.S. 222, 233 (1985).

Although neither *Richardson* nor *Hunter* addresses the precise question before this panel, both cases emphasize that the ability to disenfranchise stems directly and solely from an individual's commission of a qualifying crime, as contemplated by the plain language of § 2 of the Fourteenth Amendment. They further counsel that laws related to felon suffrage are not immune from constitutional attack and that there are some instances in which such laws will be invalid. Analyzing § 40-29-202(c) in light of *Richardson* and *Hunter*, even assuming it could withstand traditional rational-basis scrutiny, I believe that, in order to withstand a constitutional challenge, the basis upon which the states may condition reenfranchisement for felons must be related to the criminal conviction for which the State was first authorized to abridge suffrage—i.e., the Constitution's explicit "affirmative sanction" for such laws. *See Shepard*, 575 F.2d at 1114 ("Nor can we believe that section 2 would permit a state to make a completely arbitrary distinction between groups of felons with respect to the right to vote."); *Owens*, 711 F.2d at 27 (expressing sincere doubt that the state could "disenfranchise similarly situated blue-eyed felons but not brown-eyed felons"). The requirement that the Plaintiffs pay child-support arrears prior to the restoration of their right to vote cannot meet this test, as it is a requirement completely divorced from the underlying conviction for which the U.S. Constitution authorized Tennessee to disenfranchise the Plaintiffs.

The suspect nature of this particular provision is reinforced by cases from both federal and state courts that have addressed and upheld the constitutionality of various laws relating to felon disenfranchisement.  *See, e.g.*, *Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010); *Hayden v. Paterson*, 594 F.3d 150 (2d Cir. 2010); *Owens*, 711 F.2d at 27–28; *Shepard*, 575 F.2d at 1114; *Madison v. Washington*, 163 P.3d 757 (Wash. 2007). Unlike the child-support-payment provision at issue here, the laws in each of the above-referenced cases involved distinctions or classifications falling into two general, somewhat overlapping, categories that were undeniably related to the predicate conviction:   (1) laws requiring that the felon complete the sentence for the disenfranchising felony and (2) laws differentiating between the type of felony committed or the type of sentence imposed for that felony.

In the first category of cases, the laws at issue in both *Harvey* and *Madison* conditioned reenfranchisement on whether the felon seeking the right to vote had completed the sentence for the disenfranchising felony.  In *Harvey*, the law provided that a person convicted of a single felony automatically was entitled to the restoration of the right to vote if the person paid "'any fine or restitution imposed." *Harvey*, 605 F.3d at 1070 (quoting Ariz. Rev. Stat. § 13-912(A)).  The Ninth Circuit upheld the restitution-repayment requirement on the grounds that "Arizona has a rational basis for restoring voting rights only to those felons who have completed the terms of their sentences, which includes the payment of any fines or restitution orders."  *Id.* at 1079.  The panel continued by noting that "[j]ust as States might reasonably conclude that perpetrators of serious crimes should not take part in electing government officials, so too might it rationally conclude that only those who have satisfied their debts to society through fulfilling the terms of a criminal sentence are entitled to restoration of their voting rights."[3]  Similarly, in *Madison*, the Washington Supreme Court upheld a statute that required felons seeking the restoration of suffrage to satisfy any outstanding victim restitution, court costs, and fees associated with their disenfranchising felonies. *Madison*, 163 P.3d at 761, 772.  The court reasoned that the restitution was part of the

---

[3]Notably, the panel reserved the question of whether "withholding voting rights from those who are truly unable to pay" would satisfy rational-basis scrutiny.  *Harvey*, 605 F.3d at 1080.

felony sentences and that "[t]he State clearly has an interest in ensuring that felons complete all of the terms of their sentence." *Id.* at 772. *Harvey* and *Madison* are thus distinguishable from the instant case with respect to subsection (c) because Tennessee is conditioning the restoration of suffrage on the payment of a sum of money that was neither part of the sentence for the predicate felony nor remotely related to the rehabilitation for the disenfranchising conviction.

The second type of case where courts have upheld felon-disenfranchisement laws that distinguished among felons involves provisions that set reenfranchisement eligibility on the basis of the type of sentence the felon received for the predicate felony or the type of disenfranchising felony that the individual committed. As with the first category of cases, these distinctions also relate to rehabilitation for the underlying offense. For example, in *Hayden v. Paterson*, a panel of the Second Circuit upheld two separate felon-disenfranchisement provisions against an equal-protection challenge. The provisions at issue disenfranchised incarcerated felons and unincarcerated felons "who ha[d] finished their prison terms, but [who were] still on parole" but allowed those felons who received "suspended sentences" to regain the right to vote. *Hayden*, 594 F.3d at 171. Although believing it an "oddity" that the State would distinguish between felons in the manner that it did, the panel nevertheless determined that such distinction was rational. *Id.* After all, the legislature could have believed that the type of sentence imposed for a potentially disenfranchising conviction was a reflection of the seriousness of the individual's crime and by extension the individual's ability to be a responsible voting citizen. *See id.* ("Where a judge has determined that imprisonment is not necessary it is difficult to perceive any useful purpose to be served by denying a convicted person the right to vote during the period of probation or conditional release." (quoting a letter from the Legal Aid Society)); *see also Owens*, 711 F.2d at 27–28 (upholding a statute that allowed unincarcerated felons to vote but disenfranchised incarcerated felons); *Shepard*, 575 F.2d at 1114–15 (deeming constitutional a provision that reenfranchised felons who were convicted in state court but that required federal felons to obtain a presidential pardon). Again, however, *Hayden*, *Owens*, and *Shepard* are distinguishable from the instant case because, as in *Madison* and *Harvey*, the laws'

classifications were related to the predicate felony for which the state was authorized to disenfranchise the felons in the first place, and the laws furthered the states' interests in disenfranchising particular felons as a result of their criminal activity—i.e., the "affirmative sanction" for disenfranchisement found in the Constitution.

By differentiating between those felons who owe a financial obligation completely unrelated to their crime, § 40-29-202(c) is materially distinct from those provisions that courts have held withstand scrutiny. As the Supreme Court emphasized in *Richardson*, the Constitution expressly limits the government's power to disenfranchise to only those individuals who have committed a crime, and I believe that any law further qualifying a felon's right to vote must be viewed in light of the Constitution's limitation. I thus question whether those classifications that are wholly unrelated to the predicate conviction, such as § 40-29-202(c), can ever be constitutional, even assuming we can develop some reason that they may, in fact, be rational.

### 4. Conclusion

In conducting a rational-basis inquiry, we "seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose." *Plyler*, 457 U.S. at 216. However, "[r]ational basis review, while deferential, is not 'toothless.'" *Peoples Rights Org., Inc. v. City of Columbus*, 152 F.3d 522, 532 (6th Cir. 1998) (quoting *Mathews v. Lucas*, 427 U.S. 495, 510 (1976)). In light of the absence of any rational purpose for the disparate treatment sanctioned by § 40-29-202(b) and (c), as well as the Supreme Court's reluctance to deem rational state-imposed qualifications drawn along economic lines that inhibit the exercise of any right over which the state has a monopoly, I would hold that the provision requiring payment of child support and restitution prior to the restoration of suffrage, regardless of an individual's ability to pay, cannot withstand constitutional scrutiny.

One of the primary reasons that "courts are quite reluctant to overturn governmental action on the ground that it denies equal protection of the laws" is because "[t]he Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process." *Vance*

*v. Bradley*, 440 U.S. 93, 97 (1979); *City of Cleburne*, 473 U.S. at 440. The instant case, however, is a perfect example of when this is unlikely to be the case. A "restriction[] upon the right to vote" undeniably "restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation." *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 n.4 (1938). Felons are clearly a politically unpopular group, and it is unlikely that anyone else will carry the banner for them. The district court erred in granting judgment on the pleadings with regard to this claim, and I must respectfully dissent from the majority's resolution of the Plaintiffs' Equal Protection Clause challenge.

## B. Twenty-Fourth Amendment Claim

Turning to the Plaintiffs' next claim, I would hold that the Plaintiffs have alleged sufficient facts to state a claim for relief under the Twenty-Fourth Amendment to the U.S. Constitution and that judgment on the pleadings was therefore improper. Section 1 of the Twenty-Fourth Amendment provides, in relevant part, that the right to vote in federal elections "shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax." U.S. Const. amend. XXIV. The Amendment was enacted to prevent "the disenfranchisement of the poor," *Harman v. Forssenius*, 380 U.S. 528, 539 (1965), and by its plain language creates an absolute prohibition on "any poll tax or other tax." U.S. Const. amend. XXIV.

The Twenty-Fourth Amendment is not subject to the same analysis as a statute under the Equal Protection Clause of the Fourteenth Amendment, with its various forms of scrutiny, or the balancing tests set forth in the Supreme Court's voting-rights cases. Instead, if a payment constitutes a "poll tax or other tax," U.S. Const. amend. XXIV, and it denies or abridges the right to vote, then it is unconstitutional. It does not matter whether an individual is capable of paying. *See Harman*, 380 U.S. at 542 ("For federal elections, the poll tax is abolished absolutely as a prerequisite to voting . . . ").[4] A threshold question that the court must face when confronted with the Plaintiffs' Twenty-

---

[4]*See generally* Allison R. Hayward, *What Is an Unconstitutional "Other Tax" on Voting? Construing the Twenty-Fourth Amendment*, 8 Elect. L.J. 103 (2009).

Fourth Amendment claim, however, is whether the payments at issue here constitute a "tax" within the meaning of the Amendment. Because I believe that the Amendment's prohibition on "other tax[es]" includes portions of the payments potentially required under § 40-29-202(b) and (c), and that the Plaintiffs' right to vote is being abridged or denied by their failure to pay those taxes, I would hold that judgment on the pleadings with respect to this claim was improper.

There is relatively little guidance from the Supreme Court as to the scope of the Twenty-Fourth Amendment apart from its decision in *Harman*,[5] which was the Court's first opportunity to construe the Amendment. *Harman*, 380 U.S. at 529. In *Harman*, the Court addressed the validity of Virginia's newly amended voter-registration law, which, in direct response to the enactment of the Twenty-Fourth Amendment, had "removed the poll tax as an absolute prerequisite to qualification for voting in federal elections, but in its stead [had] substituted a provision whereby the federal voter could qualify either by paying the customary poll tax or by filing a certificate of residence six months before the election." *Id.* at 540. The Supreme Court concluded that "in order to demonstrate the invalidity of" the Virginia provision under the Twenty-Fourth Amendment, "it need only be shown that [the statute] impose[d] a material requirement solely upon those who refuse[d] to surrender their constitutional right to vote in federal elections without paying a poll tax." *Id.* at 541. In other words, the statute was unconstitutional if the requirement that the individual file a certificate of residency imposed a material obstacle upon the voting ability of those "those who assert[ed] their constitutional exemption from the poll tax." *Id.*

After reviewing the certificate-of-residency requirement, the Court held that the filing requirement that the statute "imposed upon the voter who refuse[d] to pay the poll tax constitute[d] an abridgment of [the] right to vote by reason of failure to pay the poll tax" and contravened the Twenty-Fourth Amendment. *Id.* at 542. It is important to note,

---

[5]*See generally* Bruce Ackerman & Jennifer Nou, *Canonizing the Civil Rights Revolution: The People and the Poll Tax*, 103 Nw. U. L. Rev. 63 (2009) (highlighting the Supreme Court's lack of discussion and litigants' lack of assertion of the Twenty-Fourth Amendment in several important voting-rights cases, including *Harper* and *Crawford*).

however, that the Court in *Harman* did not opine on whether the certificate-of-residency requirement itself fell within the Amendment's "other tax" language. Thus, the Supreme Court has not addressed directly the threshold question presently before this panel: Whether the requirement that the Plaintiffs pay restitution and child-support arrears amounts to a "tax" within the meaning of the Twenty-Fourth Amendment's proscriptions.[6]

The majority claims that § 40-29-202(b) and (c) do not invoke the Twenty-Fourth Amendment's protections because they condition voting on payments of obligations that the "Plaintiffs themselves incurred," and "do not represent taxes on voting imposed by the state." Maj. Op. at 12. I believe this reasoning infirm. Certainly, the types of payments at issue here are distinguishable from those in *Harman* and *Harper*. The contested payments in both of those cases were the payments that most commonly come to mind upon hearing the term "poll tax": That is, "[a] capitation tax; a tax of a specific sum levied upon each person within the jurisdiction of the taxing power and within a certain class," or "[a] tax upon the privilege of being." Black's Law Dictionary 1159 (6th ed. 1990);[7] *see Harper*, 383 U.S. at 668–69 ("Levy by the poll . . . is an old familiar form of taxation." (internal quotation marks omitted)); *see also Harman*, 380 U.S. at 529 n.1, 530–32 (describing the State of Virginia's poll-tax provisions). The payments at issue here are not capitation or head taxes. But, as mentioned, the plain text of the Twenty-Fourth Amendment does not prohibit only capitation taxes as a voting

---

[6]As previously mentioned, the Supreme Court also addressed the validity of a "poll tax" in *Harper v. Virginia State Board of Elections*, and ultimately declared the poll tax in state elections unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. *Harper*, 383 U.S. at 666. Although *Harper* neither invoked nor construed the Twenty-Fourth Amendment, it is nonetheless helpful in assessing the evils at which the Amendment was aimed. As with *Harman*, the issue of what amounts to a poll tax or other prohibited tax was not before the Court in *Harper*.

[7]Conceptually, it is important to remember that the poll tax "originally had nothing to do with voting." Fagan Dickson, *The Poll Tax and Voter Registration*, 35 Tex. L. Rev. 1031, 1031 (1957). It was assessed independently of the exercise of any right. As Professor Hayward, explains:

> The misimpression that a poll tax must be a tax on voting no doubt derives in part from the fact that we refer to voting places as polling places. But "poll" originally was a term referring to the human head. At the polls we count heads and a poll tax is a head tax. See, for example, Ophelia's lament: "His beard was as white as snow, / All flaxen was his poll." William Shakespeare, Hamlet, IV, 5.

Hayward, *supra* n.4, at 104 n.5; *see also Harper*, 383 U.S. at 668 n.5 ("Maine has a poll tax which is not made a condition of voting; instead, its payment is a condition of obtaining a motor vehicle license or a motor vehicle operator's license." (internal citations omitted)).

qualification. The plain language of the Amendment precludes the imposition of any "other tax," and the *Harman* Court made plain that because the Amendment's drafters intended the Amendment to "nullif[y] sophisticated as well as simple minded modes of impairing the right" to vote, *Harman*, 380 U.S. at 540–41 (internal quotation marks omitted), the absolute prohibition on taxes includes their "equivalent or milder substitute[s]." *Id.* at 542.

### 1. Portions of the Payments Under § 40-29-202(b) and (c) Are Taxes.

There is a notable absence of case law developing what constitutes an "other tax" such that it falls within the purview of the Twenty-Fourth Amendment. And those cases that do address whether a particular payment amounts to a tax are largely unhelpful because they deal almost exclusively with the costs levied indirectly on the right to vote as a result of voter-identification requirements and fail to analyze the issue under the Twenty-Fourth Amendment's "other tax" language. *See, e.g.*, *Gonzalez v. Arizona*, 485 F.3d 1041, 1049 (9th Cir. 2007) (holding, without much discussion, that Arizona's identification law did not amount to a poll tax under the Twenty-Fourth Amendment); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 826–27 (S.D. Ind. 2006) (rejecting a poll-tax challenge to Indiana's photo-identification law, but curiously failing to cite or explicitly analyze the Twenty-Fourth Amendment), *aff'd sub nom. Crawford v. Marion County Election Bd.*, 472 F.3d 949 (7th Cir. 2007), *aff'd* 128 S. Ct. 1610 (2008); *Common Cause/Ga. v. Billups*, 439 F. Supp. 2d 1294, 1354–55 (N.D. Ga. 2006) (holding Georgia's revised photo-identification statute did not constitute a poll tax under the Twenty-Fourth Amendment); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1366–70 (N.D. Ga. 2005) (finding "a substantial likelihood of success" on the claim that Georgia's photo-identification requirement imposed an unconstitutional poll tax in violation of the Twenty-Fourth Amendment); *In re Request for Advisory Opinion Regarding Constitutionality of 2005 PA 71*, 740 N.W.2d 444, 463–66 (Mich. 2007) (holding that Michigan's identification law did not amount to a poll tax under the Twenty-Fourth Amendment and agreeing with *Rokita*'s reasoning); *cf. Weinschenk v. State*, 203 S.W.3d 201, 213–14 (Mo. 2006) ("While requiring payment to obtain a birth

certificate is not a poll tax . . . it is a fee . . . [and] *Harper* makes clear that all fees that impose financial burdens on eligible citizens' right to vote, not merely poll taxes, are impermissible under federal law.").

As the precise question at issue here is one of first impression in this Circuit, I turn first to the Twenty-Fourth Amendment's text. The Supreme Court has emphasized on numerous occasions that in interpreting the text of an Amendment, the courts "are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning.'" *District of Columbia v. Heller*, 128 S. Ct. 2783, 2788 (2008) (quoting *United States v. Sprague*, 282 U.S. 716, 731 (1931)) (alteration in original). "Normal meaning may of course include an idiomatic meaning, but it excludes secret or technical meanings that would not have been known to ordinary citizens" at the time the Amendment was proposed and ratified. *Id.*

> Section 1 of the Amendment reads:
>
> The right of citizens of the United States to vote in any primary or other election for President or Vice President, for electors for President or Vice President, or for Senator or Representative in Congress, shall not be denied or abridged by the United States or any State by reason of failure to pay any poll tax or other tax.

U.S. Const. amend. XXIV. In determining what types of "other tax[es]" the drafters had in mind, the common dictionary definitions of the term "tax" are a useful starting point. At the time of the Twenty-Fourth Amendment, "tax" was ordinarily defined as "a usu[ally] pecuniary charge imposed by legislative or other public authority upon persons or property for public purposes: a forced contribution of wealth to meet the public needs of a government." Webster's Third New International Dictionary 2345 (14th ed. 1961 & 15th ed. 1966). Similarly, the legal definition of "tax" at the time of the Amendment's debate and ratification was "[a] forced burden, charge, exaction, imposition, or contribution assessed in accordance with some reasonable rule of apportionment by authority of a sovereign state upon the persons or property within its jurisdiction to provide public revenue for the support of the government, the administration of the law,

or the payment of public expenses." Ballentine's Law Dictionary 1255 (3d ed. 1969); *see* Black's Law Dictionary 28 (4th ed. 1951) ("[A] pecuniary contribution . . . for the support of a government."); *see also United States v. State Tax Comm'n of Miss.*, 421 U.S. 599, 606 (1975) (indicating that the "standard definition of a tax" is an "'enforced contribution to provide for the support of government.'" (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)). In essence, a "tax" at the time of the Amendment had the following essential components: (1) that it be levied by the government (2) for the support of the government or the general public.

Contrary to the Plaintiffs' contention, the entirety of the payments at issue here is unlikely to fit the common definition of "tax." Although child-support and restitution orders amount to forced monetary contributions imposed by the State of Tennessee or the U.S. Government, their primary purpose is to benefit dependent children and the victims of the Plaintiffs' criminal actions, as opposed to the public needs of the government. As a result, I believe that as a general matter these payments may be more appropriately viewed as debts. *See* Black's Law Dictionary 1628–29 (4th ed. 1951) (noting in the "Practice" section of the definition of "tax" that a tax, "[i]n a general sense, [is] any contribution imposed by government upon individuals, for the use and service of the state, whether under the name of toll, tribute, tallage, gabel, impost, duty, custom, excise, subsidy, aid, supply, or other name. And in its essential characteristics is *not a debt*" (emphasis added)); *see also United States v. Reorganized CF&I Fabricators of Utah, Inc.*, 518 U.S. 213, 220, 224 (1996) (distinguishing between a tax and a debt under bankruptcy law); *cf. Jenny Lynn Mining Co. v. Ohio Dep't of Natural Res.*, 780 F.2d 585, 589 (6th Cir. 1986) ("One of the characteristics of a tax as opposed to a fee is that a tax is an exaction for public purposes rather than a voluntary payment for a private benefit.").

But, in fact, I need not decide that broader question here because my inquiry does not end with consideration of the entirety of the payments required under § 40-29-202(b) and (c). Although we may understand child-support and restitution payments as generally being paid for the benefit of a party other than the government, a closer

inspection of the obligations at issue here indicates that the government does reap a specific and definable pecuniary benefit from at least some of the obligations required by Tennessee's statute. In the case of child-support arrears, Tennessee law specifically authorizes the State to augment an individual's obligation by five percent, which is payable to the government and is plainly for its benefit. With regard to state and federal restitution orders, there are also instances in which the government is the recipient and intended beneficiary of an individual's payments. Thus, regardless of whether the entirety of the payments required by § 40-29-202(b) and (c) can be properly defined as taxes in each case where they are imposed, at least some of those required payments can be so classified.

Looking to Tennessee's child-support-payment provisions, pursuant to Tennessee Code § 8-21-403(a), the Tennessee clerk of a court who "receiv[es], handl[es,] and disburs[es] . . . child support . . . under and by order of court is entitled to charge and receive from the obligor the sum of five percent (5%) for any and all payments received during each calendar month." The five-percent addition is not levied separately from the child-support order; instead, it is "an obligation of the obligor and shall be added to the amount of court-ordered child support, making the total obligation of the obligor the support plus the clerk's fee." *Id.* In the event that an individual can afford to pay a portion of his or her child-support arrears and remits that payment to the clerk, the clerk is directed to "prorate any such partial payment as to support and clerk's fee." *Id.* Thus, despite having paid the totality of the original sum owed, an individual would still be precluded from voting as a result of the failure to pay only the state's five-percent levy. In essence, although a child-support obligation in the most general sense may be more properly considered something other than a tax, the five-percent levy added to that obligation, and which by statute becomes part of that obligation, is an enforced contribution in support of the government—i.e., a "tax."[8]

---

[8]The fact that a five-percent charge may represent a relatively small amount and would not result in much, if any, increase in state revenue is not dispositive in determining whether these payments amount to the type of "other tax" that the Twenty-Fourth Amendment forbids. If small payments were exempt from the definition, the poll tax itself would pass constitutional muster. The amount of money that remained with the State from a poll tax tied to voting prior to the Twenty-Fourth Amendment's ratification was de minimis, and it provided no substantial revenue. *See* Frederic D. Ogden, *The Poll Tax in the South*

The restitution that § 40-29-202(b) requires an individual to pay prior to the restoration of suffrage includes both state and federal obligations, so I must look to how each operates to determine whether § 40-29-202(b) imposes an unconstitutional tax. Because there are instances where an individual is obligated to pay restitution to either the state or federal government and that money is allocated to programs for the benefit of the government and the general public, I would hold that § 40-29-202(b) can impose an invalid tax.

First, under Tennessee law, there is at least one circumstance where a defendant is required "to make restitution to the state . . . for deposit into the state general fund." Tenn. Code Ann. § 40-35-320(a), (d). I believe that in such case, the restitution would plainly amount to a "tax" because under § 40-35-320 a restitution order would amount to a forced contribution of wealth to the State for the general benefit of both the State and the public. *See also* Tenn. Code Ann. § 39-17-417(c)(2)(B) (requiring that certain drug-related sentences include "restitution to any government entity for the costs reasonably incurred in cleaning the area in which [the drug] offense occurred"). Second, in the federal system, restitution orders are generally "governed by the Victim and Witness Protection Act of 1982 ("VWPA")."[9] *United States v. Webb*, 30 F.3d 687, 689 (6th Cir. 1994) (citing 18 U.S.C. §§ 3663, 3664). Although an order of restitution under the VWPA is typically paid to and for the benefit of the victim of the crime, *id*.; *see also* 18 U.S.C. § 3663(a)(1)(A), there is, however, at least one exception relevant to the instant case. Pursuant to § 3663(c), when a defendant has been convicted of a crime under the Controlled Substances Act and when there is "no identifiable victim, the court may order that the defendant make restitution" to the federal government. 18 U.S.C. § 3663(c)(1). The money collected is then distributed to the State within which the

---

36, 55–58 (1958); *id.* at 55 ("[T]he tax is first a suffrage measure and only incidentally a means of raising revenue."); *id.* at 58 ("Where the poll tax is tied to the suffrage, its purpose is to limit the electorate and not to raise revenue.").

[9] Since the enactment of the VWPA, Congress has enacted a number of additional statutes governing restitution, including the Mandatory Victims Restitution Act of 1996 ("MVRA"), which makes restitution to victims of certain crimes mandatory, *see* 18 U.S.C. § 3663A, and supplements the VWPA. *United States v. Lincoln*, 277 F.3d 1112, 1113 (9th Cir. 2002) ("Congress enacted the MVRA as a supplement to the Victim Witness Protection Act (VWPA), 18 U.S.C. § 3663.").

crime occurred, with "65 percent of the total amount" being "paid to the State entity designated to administer crime victim assistance," *id.* § 3663(c)(3)(A), and "35 percent of the total amount of restitution" being "paid to the State entity designated to receive Federal substance abuse block grant funds," *id.* § 3663(c)(3)(B).

Restitution awarded under § 3663(c) certainly fits the above-referenced definitions of a "tax." Section 3663(c) imposes a monetary obligation upon an individual, and the statute makes plain that the restitution is collected and then redistributed to fund state-run programming for the general benefit of its citizens. *See also Reorganized CF&I Fabricators*, 518 U.S. at 224 ("[A] tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government." (internal quotation marks omitted)); *cf. Wright v. McClain*, 835 F.2d 143, 144, 145 (6th Cir. 1987) (holding that a statute requiring "any person on parole or granted a suspension of sentence in Tennessee" to pay thirty-five dollars per month into funds for the Corrections Department to "defray the cost to the general public of monitoring and supervising the behavior of convicted offenders and to compensate, in some measure, victims of criminal misconduct" imposed a tax). Again, although many restitution orders may not amount to a tax, I need not reach that broader question because some of the restitution orders that § 40-29-202(b) does encompass do impose a prohibited tax, and the Plaintiffs have stated a viable claim.[10]

## 2. Section 40-29-202(b) and (c) Operate Analogously to a Poll Tax.

My conclusion that some of the payments required under § 40-29-202(b) and (c) amount to a prohibited tax is not altered by the fact that these payments may also meet the broader definition of a debt because my analysis of whether § 40-29-202(b) and (c) require payment of a "tax" as a prerequisite to voting does not stop with definitions.

---

[10]Because the district court dismissed the case on the pleadings, the record on appeal contains little information on the Plaintiffs' obligations in either the state or federal system. As indicated above, however, the substance of these orders is important to resolving the instant case. According to a document from the U.S. Department of Justice submitted by the Plaintiffs—of which I take judicial notice—at least one of the Plaintiffs' restitution orders "may include additional costs, interest, penalties, and a surcharge" in addition to the amount the Plaintiff initially owed. Pl. Exh. A at 11. If this is the case, then the Plaintiffs' argument that portions of the restitution orders amount to a prohibited "tax" is even stronger.

Instead, a comparison of the poll tax at issue in *Harman* to the payments required here also helps to clarify the parameters of the definition of tax and provides further support for my conclusion that the Twenty-Fourth Amendment encompasses at least a portion of the payments required by § 40-29-202(b) and (c).

Tellingly, at the most fundamental level, § 40-29-202(b) and (c) operate in the same manner as the indisputably forbidden "poll tax"—they both require an individual who desires to vote to pay a monetized sum as an absolute condition to casting a ballot in a federal election. This similarity is extremely relevant given that "[o]ne of the basic objections to the poll tax was that it exacted a price for the privilege of exercising the franchise" and that the primary motivation of the Amendment was "a general repugnance to the disenfranchisement of the poor occasioned by failure to pay the tax." *Harman*, 380 U.S. at 539; *see also Harper*, 383 U.S. at 668. The fact that § 40-29-202(b) and (c) set the price for the privilege of voting at something besides a government-imposed per capita levy is not determinative. The statute sets a price nonetheless, and this is the exact evil that the Twenty-Fourth Amendment was meant to address.

The majority implies that the Twenty-Fourth Amendment prohibits only those payments that the State imposed with a specific purpose to inhibit exercise of the franchise and those payments that a person would not otherwise be required to make. The specific poll tax at issue in *Harman*, however, counsels the opposite conclusion, and provides another point of comparison between the clearly unconstitutional "poll tax" and the payments in the instant case. This again supports the conclusion that, at the very least, parts of the payments required under the Tennessee statute are properly considered taxes. In Virginia, the failure to pay the poll tax not only precluded the exercise of suffrage, but it also amounted to a separately enforceable financial obligation or debt similar to an order for restitution or an order for the payment of child-support arrears. *See Harper*, 383 U.S. at 664 n.1; Frederic D. Ogden, *The Poll Tax in the South* 64 (1958) ("In Virginia, collection of the poll tax is enforceable . . . [once] the tax has become three years past due." (citing Va. Const. § 22)). Moreover, an individual could not avoid payment of the poll tax by not voting. "Property owners [we]re assessed for the poll tax

along with assessment of their property," and "[s]ome county officials ma[d]e an effort to assess all who [we]re liable," leading to instances where "citizens pa[id] the poll tax as an item of the general tax bill without realizing that they ha[d] done so." *Id.* at 65–66. In other words, it is not true that those taxes the Twenty-Fourth Amendment prohibits can be narrowly defined to include only otherwise avoidable payments that remain uncollected except as a prerequisite to the exercise of suffrage. As the Plaintiffs in the instant case "themselves incurred" their obligations apart from their attempt to vote, Maj. Op. at 12, so did the potential federal voters in Virginia. At the time of the Twenty-Fourth Amendment, poll-tax obligations were levied by the various governments, amounted to enforceable debts, and were frequently paid regardless of whether an individual ever attempted to vote.

The poll taxes that existed in several other states at the time of the Twenty-Fourth Amendment also support the conclusion that what amounts to a prohibited "other tax" is not restricted to only those monetary obligations that are tied exclusively to the right to vote and not otherwise owed as debts or similar financial obligations. In Arkansas, payment of the poll tax was not simply a prerequisite to voting but was required to obtain "a state or municipal license or permit of any kind and to receive any salary or other compensation from public funds." Ogden, *Poll Tax*, *supra* at 61. "In Mississippi payment [wa]s voluntary and no bills [we]re sent out," but the State did "make the tax a lien upon taxable property." *Id.* at 63. "[P]oll tax delinquents [in Texas were] subject to three additional days of road work over the five days normally required or to the payment of a fine of $3.00," and the State "levi[ed] penalties upon [a] late poll tax payment," in the same manner "as for other delinquent taxes." *Id.* at 68. In 1948 in South Carolina, "poll tax collections were prosecuted like those for other taxes." *Id.* at 72.

Even Tennessee's poll tax, although abolished prior to the Amendment's ratification, "had fairly stringent provisions relative to its payment," *id.*, and amounted to a financial obligation regardless of and independent from the desire or attempt to exercise franchise. As reflected in the Tennessee Code from 1934, the payment of the

poll tax was tied to the payment of property taxes, the state levied penalties for delinquency, and delinquent taxpayers were at risk of "the sale of his personal property and to garnishment proceedings." *Id.*; *see* Williams Tenn. Code §§ 1559, 1547, 1574, 1577 (1934). Again, analogous to the payments that the Plaintiffs in the instant case face, poll-tax assessments were individually incurred, independently collectable financial obligations that were owed regardless of one's actual attempt to exercise the right of suffrage. Thus, although the child-support arrears and restitution payments outlined above could also be classified as debts, so too could those poll taxes in existence at the time of the Twenty-Fourth Amendment's ratification.

In sum, the text of the Amendment as well as the similarities between the quintessential "poll tax" at issue in *Harman* and the payments challenged here lead me to conclude that portions of the financial preconditions to voting that the Plaintiffs now face amount to a tax on voting of the kind that the Twenty-Fourth Amendment prohibits.

**3. The Legislative History of the Twenty-Fourth Amendment Indicates that Congress Intended to Preclude the Payment of Money Generally.**

The legislative history of the Twenty-Fourth Amendment further supports my conclusion that at least a portion of the child-support and restitution orders under § 40-29-202(b) and (c) falls within the drafters' conception of the Amendment's prohibition. The Senate did not issue a Committee Report for the Amendment until after it was approved. *See* S. Rep. No. 87-305, at 11–13 (1962). The contemporaneous House of Representatives Committee Report, however, does recognize that the Amendment's text extended beyond poll taxes and "would also prevent both the United States and any State from setting up any substitute tax in lieu of a poll tax." *See* Proposed Constitutional Amendment: Poll Tax as a Qualification for Voting, H.R. Rep. No. 87-1821 (1962), *reprinted in* 1962 U.S.C.C.A.N 4033 (1962). The House Report stopped short of delineating what types of taxes qualified as these "substitute tax[es]," but the Report indicated that the Amendment would "prevent[] the nullification of the amendment's effect by a resort to subterfuge." *Id.* at 4037. The types of payments that fall within the definition of "tax" must therefore be determined with this legislative purpose in mind.

Certainly the requirement that an individual pay the above-described sums as a prerequisite to voting thwarts the stated purpose of the Amendment to eliminate pecuniary "obstacle[s] to the proper exericse [sic] of a citizen's franchise." *Id.* at 4035.

The Senate and House debates, as well as the House hearings on the elimination of the poll tax, further indicate that Congress envisioned that the Amendment's prohibition on the use of an "other tax" would encompass the payments of money generally and would certainly reach those portions of child-support and restitution orders payable to the government and for its benefit, if not the obligations in their entirety. For example, during the Hearings before the House Committee on the Judiciary, Representative Gonzalez indicated that "[t]here should not be any price tag or any other kind of tag on the right to vote." *Abolition of Poll Tax in Federal Elections: Hearing on H.J. Res. 404, 425, 434, 594, 601, 632, 655, 663, 670 & S.J. Res. 29 Before the Subcomm. No. 5 of the H. Comm. on the Judiciary*, 87th Cong., 2d Sess. 15 (1962). And alluding to the manner in which I have analyzed the Tennessee provisions above, Representative Gonzalez counseled that "tax" should be defined "within the framework of the history and the payment of the poll tax or similar taxes." *Id.* at 17. The Hearings also addressed the "other tax" language directly, noting that it was fairly broad and would prevent the government from levying "say, a property tax, a real estate, ad valorem[] tax[,] . . . [or] a property tax on automobiles." *Id.* at 51.

The Senate debates did not address at any length the potential scope of the Amendment's "other tax" language or what might amount to a forbidden poll-tax substitute. Senator Javits, however, spoke of eliminating any "encumbrance" on the right to vote of the poll tax's "character." 108 Cong. Rec. at 4155. As outlined above, at least some of the payments required under § 40-29-202(b) and (c) share fundamental characteristics with the poll tax. Again, they are forced monetary contributions paid to the government for the benefit of the government or the general public, regardless of the fact that may also amount to independently collectable debts.

The statements made during the House debates are a bit more helpful in defining those payments that the Amendment was intended to reach, and they demonstrate that

it was not only those payments that fit within the technical definition of a tax that the Amendment targeted. Representative Fascell, explaining his support for the Amendment, made clear that "the *payment of money* whether directly or indirectly, whether in a small amount or in a large amount should never be permitted to reign as a criterion of democracy." 108 Cong. Rec. at 17657 (emphasis added). "There should not be allowed a scintilla of this in our free society." *Id.* Representative Joelson also spoke in support of the Amendment, declaring it "unthinkable that in the United States, there are still areas in which American citizens are required to pay for the right to vote." *Id.* at 17662. Representative Boland stated that "there should not be any *price tag or any kind of tax* on the right to vote." *Id.* at 17666 (emphasis added). "For some people, this financial imposition may be enough to discourage participation in the electoral process." *Id.* Representative Yates exclaimed that, "[p]lacing the *payment of a fee* between the voter and the ballot box is distinctly not in keeping with the ideals of our democracy." *Id.* (emphasis added). Representative Gallagher stated, "*Any charge* for voting unjustly discriminates against people of limited means." *Id.* at 17667 (emphasis added). "And whatever the amount of money, a citizen of the United States should not have to pay for his constitutional right to vote." *Id.* Representative Curtis highlighted the "important right to cast a free ballot." *Id.* at 17668. And, finally, Representative Halpern advocated for the Amendment's passage as a step toward "outlawing th[e] undemocratic, feudal practice of placing a *price tag* on the right to vote." *Id.* at 17661 (emphasis added).

The drafters and supporters of the Twenty-Fourth Amendment plainly intended that the Amendment reach those payments of money that placed a price on the franchise, regardless of whether those taxes could also be characterized as debts or fees. *See Harman*, 330 U.S. at 542. Reading "tax" too restrictively would undoubtedly conflict with this overarching intent. In fact, albeit in the context of striking down the poll tax as unconstitutional in state elections under the Fourteenth Amendment, the *Harper* Court used the term "tax" interchangeably with "fee" in discussing the primary evil of the poll tax. *See Harper*, 383 U.S. at 668 ("The principle that denies the State the right to dilute a citizen's vote on account of his economic status or other such factors by analogy bars a system which excludes those unable to pay a *fee* to vote or who fail to pay." (emphasis

added)).  This evidences the broader common understanding of what amounted to a tax on voting only a few short years after the Amendment's ratification, and, by extension, what meaning "other tax" may have had.  It also emphasizes that the primary objection to the poll tax was the imposition of *any* pecuniary obstacle on an individual's right to vote.

In sum, a plain reading of the Twenty-Fourth Amendment's text, an analysis of the types of payments against which the drafters of the Amendment intended to guard based on the common understanding of the operation and characteristics of a "poll tax," and the legislative history of the Amendment leave me without a doubt that at least portions of Tennessee's required payments fall within the scope of the Amendment and constitute a prohibited "other tax."  It is worth emphasizing again that the Amendment was enacted with the purpose of thwarting "sophisticated as well as simple minded" attempts to disenfranchise the poor.  *Harman*, 380 U.S. at 540.  And although the payments here may be reasonably justified outside of the election context, they are completely without a function in the State's administration of federal elections.

### 4.  Section § 40-29-202(b) and (c) Abridge the Right to Vote.

Having concluded that at least portions of the payments required under § 40-29-202(b) and (c) amount to the type of "tax" that the Twenty-Fourth Amendment prohibits, I turn to whether those taxes deny or abridge the right to vote.  *See* U.S. Const. amend. XXIV.  They plainly do.  Although it was the disenfranchisement statute that first denied the Plaintiffs the right to vote following their felony convictions, the Plaintiffs would be eligible automatically for the restoration of suffrage *but for* the pecuniary preconditions in § 40-29-202(b) and (c).  In short, the only reason that the State is able to continue to deny the Plaintiffs the right to vote is because they are unable to pay what § 40-29-202(b) and (c) require.  The Plaintiffs' right to vote in federal elections is impaired "by reason of failure to pay the . . . tax," *Harman*, 380 U.S. at 544, and for no other reason.[11]

---

[11]The majority's statement that the Twenty-Fourth Amendment is inapplicable because Tennessee's "provisions do not *dis*enfranchise" the Plaintiffs "or anyone else," Maj. Op. at 11 (emphasis added), fails to recognize that although an explicit disenfranchisement provision is the most extreme example of a provision that denies or abridges the right to vote, it is not the only one.  It bears repeating

The district court erred in granting judgment on the pleadings on the Plaintiffs' claim under the Twenty-Fourth Amendment.

## C. Tennessee State-Law Ex Post Facto Claim

With regard to the Plaintiffs' state-law ex post facto claim, I also depart from the majority's conclusion, and I would hold that § 40-29-202(b) and (c) are punitive in nature and that their retroactive application contravenes the Constitution of the State of Tennessee.[12]

Article I, Section 11 of the Tennessee Constitution prohibits the creation of ex post facto laws. Tenn. Const. art. 1, § 11. "[T]he application of the Ex Post Facto Clause is a legal question subject to de novo review." *Doe v. Bredesen*, 507 F.3d 998, 1002 (6th Cir. 2007) (considering the U.S. Constitution). We also review de novo a district court's interpretation of a state constitution. *Id.* at 1003. Tennessee courts generally look to interpretations of the federal provision for guidance when analyzing state-based ex post facto claims. *Id.* at 1008. The Tennessee Supreme Court has indicated, however, that the state clause is interpreted more broadly than the federal one and provides stronger protection. *See Miller v. State*, 584 S.W.2d 758, 760–61 (Tenn. 1979) (rejecting a federal Supreme Court ex post facto holding as too restrictive under the state constitution); *see also Decker v. Carroll Acad.*, No. 02A01-9709-CV-00242, 1999 WL 332705, *12 (Tenn. Ct. App. May 26, 1999) (unpublished) (noting that with regard to the ex post facto clause, "[t]he Tennessee Constitution can provide stronger

---

that *but for* these taxes, the Plaintiffs would be otherwise entitled to cast their ballots. This is nothing more than elemental causation—it is the taxes that are denying the Plaintiffs the right to regain the franchise.

The Supreme Court and Congress have emphasized repeatedly that economic status has no bearing on an individual's ability and right to participate in the electoral process and plays no role. *See, e.g.*, *Harman*, 380 U.S. at 539; *Harper*, 383 U.S. at 666. Despite this declaration, however, under the majority's reasoning, the State would be authorized to enact a provision within Tennessee's reinfranchisement statute that explicitly required all felons to pay $1000 before casting their vote with no constitutional limitation at all. This cannot be the law.

[12]I disagree with the majority's conclusion that the Plaintiffs have appealed "only the rejection of their Tennessee constitutional claim." Maj. Op. at 13. Although not a model of clarity, the Plaintiffs' appellate brief explains in several places that they believe the enforcement of the challenged statute violates both the state and federal ex post facto clauses, Pls.' Br. at 3, 41, and they cite the U.S. Constitution and U.S. Supreme Court case law, in addition to state law, in support of their arguments. *See id.* at 39–47. Regardless of whether the federal claim was waived, however, I would decline to reach the merits because the Plaintiffs prevail under state law.

protection than that provided by the United States Constitution," and citing *State v. Middlebrooks*, 840 S.W.2d 317, 338 (Tenn. 1992), among other cases).

"The [federal] Ex Post Facto Clause is implicated where a law punishes retrospectively:  a law is retrospective if it changes the legal consequences of acts committed before its effective date." *Doe*, 507 F.3d at 1003 (internal quotation marks omitted).  A claim under the federal Ex Post Facto Clause generally invokes a two-part inquiry.  First, we determine the nature of the challenged law, evaluating whether it is civil, regulatory, or punitive.  *See Smith v. Doe*, 538 U.S. 84, 92 (2003).  If the legislature intended to impose a punishment and the law applies retroactively, however, then "that ends the inquiry." *Id.*  "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id.* (internal quotation marks and alteration omitted).  In conducting this examination, we consider the seven factors outlined in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963). *Smith*, 538 U.S. at 97.

Thus, the first and potentially dispositive question in the instant case is whether the provisions requiring the payment of child-support arrears and restitution as preconditions to the restoration of a felon's right to suffrage are punitive.  In making this determination, the task is one of statutory construction, *id.* at 92, which begins with legislature's declared objective, *id.* at 93, and proceeds to "[o]ther formal attributes of a legislative enactment, such as the manner of [the law's] codification or the enforcement procedures it establishes," *id.* at 94.  The express declarations of the Tennessee state courts as to the statute's purpose are also important because "state courts are the ultimate expositors of state law." *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

### 1.  Section 40-29-202(b) and (c) Are Punitive in Nature.

Conducting the proper inquiry, I would hold that the challenged provisions are punitive.  The legislative bill adding payment of restitution and child support as preconditions to the restoration of suffrage contains no express evidence regarding the Legislature's intent.  *See Doe*, 507 F.3d at 1003–04 ("We first ask whether the

Tennessee Legislature, in passing the [provisions] 'indicated either expressly or impliedly a preference for one label or the other,' i.e., civil or criminal." (quoting *Smith*, 538 U.S. at 93)).  There is also no legislative statement of reasons or committee report indicating whether the Legislature as a whole enacted § 49-29-202(b) and (c) with a civil or punitive intent.  The positioning of the challenged provisions within the "Criminal Procedure" Title of the Tennessee Code, however, does tend to indicate that the provisions are punitive.  *Cf. Kansas v. Hendricks*, 521 U.S. 346, 361 (1997) ("[The State's] objective to create a civil proceeding is evidenced by its placement of the Act within the [State's] probate code, instead of the criminal code."); *Simmons v. Galvin*, 575 F.3d 24, 43–44 (1st Cir. 2009) ("In examining Article 120[, a disenfranchisement provision,] on its face, there is no language indicating the . . . provision is penal.  Article 120 is not in the . . . criminal code, but rather [in the] civil constitutional and statutory voter qualification provisions." (internal quotation marks omitted)).  Although placement is not always dispositive, the provisions' appearance within the "Criminal Procedure" Title is particularly revealing in the instant case given the fact that the general provision governing the "[r]estoration of suffrage to persons convicted of infamous crimes"—i.e., the provision authorizing a felon-voter restoration scheme—is located in the Tennessee Code Title "Elections."  Tenn. Code Ann. § 2-2-139.  If the Legislature had merely regulatory intentions in enacting § 40-29-202(b) and (c), it could have included provisions with the other reinfranchisement provisions in the "Elections" Title as well.

Perhaps the greatest indicator of the punitive intent of § 40-29-202(b) and (c), however, is the Tennessee Supreme Court's statements regarding the State's statutory provision that first disenfranchised felons, § 2-19-143.  In striking down the retroactive application of that provision, the Tennessee Supreme Court concluded explicitly that "[l]aws disenfranchising convicted felons are penal." *May v. Carlton*, 245 S.W.3d 340, 349 (Tenn. 2008).  Because the statutory provisions governing conditions of reinfranchisement in the instant case are simply provisions governing the period of disenfranchisement, I believe that the Tennessee Supreme Court, in light of *May*, would view any law that works to restrict further a felon's right to vote by, for example, conditioning that right on the payment of money, as equally punitive.  *Cf. Gaskin v.*

*Collins*, 661 S.W.2d 865, 868 (Tenn. 1983) (rejecting as unconstitutional the "injustice of retroactive disenfranchisement").

The majority appears to believe that the Tennessee courts would find the statutory provisions civil or regulatory because *May*'s statement that disenfranchisement laws are "penal" cannot be separated from the particular question at issue in that case—whether the retroactive expansion of the crimes that qualify as "infamous" and thus permit disenfranchisement violated the ex post facto prohibition. But in concluding that § 40-29-202(b) and (c) fall outside of *May*'s scope, the majority again fails consider the statute's operation and takes an unduly restrictive view of *May*. In practice, § 40-29-202(b) and (c) achieve the exact same end as the Legislature's retroactive classification of additional crimes as "infamous" in *May*, albeit via different means. As compared to the pre-2006 version of the law, the challenged provisions make it more difficult to have the right of suffrage restored. In concluding otherwise, the majority fails to acknowledge that § 40-29-202(b) and (c) prolong the period of clearly penal disenfranchisement. *See infra* Part I.C.2.

Under the present statutory scheme, as compared to the law that was in effect when the Plaintiffs were convicted, sentenced, and disenfranchised, the State denies the Plaintiffs the right to vote solely because of their inability to pay outright their outstanding restitution or child support. Because the Plaintiffs would have been otherwise entitled to vote automatically prior to the 2006 amendments, the statute in the instant case in its operation essentially expands the list of acts for which the State is authorized to disenfranchise. What is perhaps even more troubling about these provisions when compared to those that the court faced in *May*, however, is that the State is achieving covertly that which it could not accomplish outright even on a prospective basis. Tennessee is not authorized to deny the right to vote for mere failure to pay an obligation, as that act is not an "infamous" crime, and the State is certainly not authorized to do so in instances where the individual has yet to be convicted of any act

related to the alleged nonpayment.[13]  Yet, this is the practical effect of § 40-29-202(b) and (c).

In sum, I disagree with the majority's conclusion that § 40-29-202(b) and (c) are not punitive in intent.  The Legislature's placement of the provisions within the "Criminal Procedure" Title of the Tennessee Code, coupled with the fact that the provisions prolong penal disenfranchisement, lead me to conclude that the Tennessee legislature enacted these provisions with a punitive intent.

### 2.  Section 40-29-202(b) and (c) Are Retrospective and Disadvantage the Plaintiffs' Rights.

Because I would conclude that § 40-29-202(b) and (c) are punitive for purposes of the state ex post facto analysis, I next turn to whether the law is "retrospective" and whether it works to "disadvantage the offender affected by it." *State v. Pike*, 978 S.W.2d 904, 925 (Tenn. 1998) (internal quotation marks omitted); *id.* at 926 (indicating that only laws that affect substantive rights may disadvantage the offender).  Here, § 40-29-202(b) and (c) are retrospective in that they apply "to events occurring before its enactment." *Pike*, 978 S.W.2d at 925 (internal quotation marks omitted).  The Plaintiffs were tried, convicted, sentenced, and disenfranchised prior to 2006, which was the year that the Legislature enacted the challenged provisions.  The law works to disadvantage the Plaintiffs' substantive rights by imposing upon them a greater punishment—a lengthened period of disenfranchisement—than they would have received prior to 2006.  More specifically, § 40-29-202(b) and (c) preclude the Plaintiffs from regaining their fundamental right of suffrage upon mere completion of their sentence, as they would have been entitled to do under the pre-2006 framework.  Instead, the provisions require the payment of monetary obligations that the Plaintiffs cannot make.  As I have emphasized repeatedly, were it not for the provisions, the Plaintiffs would now be able to vote.

---

[13] The majority also believes the fact that restitution and child-support obligations exist to serve a civil and social purpose, as opposed to a penal one, is somehow dispositive.  That observation misses the mark.  It is not the requirement that the Plaintiffs ultimately make these payments that I find unconstitutional.  Rather, it is the State's decision to condition the Plaintiffs' ability to regain the right to suffrage on those payments that is punitive in intent.

The majority disagrees with this conclusion. It posits that the Plaintiffs' punishment did not change after the 2006 amendments and that § 40-29-202(b) and (c) do not amount to punishment. Again, however, this conclusion fails to recognize that § 40-29-202(b) and (c), in fact, increase the *length* of the Plaintiffs' punishment. It also fails to recognize that retroactive changes to the *length* of a particular punishment implicate Tennessee's ex post facto prohibition regardless of whether the *type* of punishment remains constant. *See State v. Pearson*, 858 S.W.2d 879, 883 (Tenn. 1993) (indicating that the proper inquiry is "whether the law changes the punishment to the defendant's disadvantage, or inflicts a greater punishment than the law allowed when the offense occurred"). No one contests that prior to the 2006 amendments, the Plaintiffs would have regained suffrage upon completion of their imprisonment, parole, and probation. Now they are disenfranchised (i.e., punished) for a longer period of time; i.e., until they are able (if ever) to pay their outstanding obligations. It is indisputable that this potential for an extended period of punishment was nonexistent when the Plaintiffs were first disenfranchised.

Considering the majority's belief that a change in the length of punishment is constitutionally irrelevant in the context of a different type of punishment, such as imprisonment, the logical flaw becomes apparent. For example, under the Ex Post Facto Clause of the U.S. Constitution, which provides less protection than the state constitution, Tennessee courts have held that the State is prohibited from enacting a law that provides a prisoner with prison-release credits for good behavior (which, like reenfranchisement, the State is not required to do) and then via subsequent legislation enacting a law that retroactively reduces the number of credits the prisoner could earn (in other words, impose upon the prisoner a provision that makes it harder to gain early release). *See Allen v. Campbell*, No. M2001-00277-COA-R3-CV, 2002 WL 373246, at *4 (Tenn. Ct. App. Mar. 11, 2002) ("Sentence reduction credit statutes in effect at the time of the commission of a crime are . . . an inherent part of [a prisoner's] sentence; consequently, application to him of a system of sentence credits which reduces the amount of credit he is eligible to receive, if such application effectively imposes a greater punishment at a date after the offense, is subject to constitutional attack [under

the Ex Post Facto Clause of the U.S. Constitution]."); *see also Garrett v. Little*, No. M2008-01867-COA-R3-CV, 2009 WL 2432974, at *7 (Tenn. Ct. App. Aug. 7, 2009) (same). But under the majority's reasoning, the State would be able to do so. After all, the new law governing early-release credits would affect only the availability of early release; the punishment itself—imprisonment—would remain constant. *Allen* and *Garrett* make plain that this is not the law in Tennessee. Disenfranchisement is a mandatory part of a felon's sentence under § 40-20-112, and Tennessee case law indicates that we must treat § 40-29-202(b) and (c) as imposing a greater punishment by extending the length of disenfranchisement—a recognized punitive measure—and making more difficult the Plaintiffs' ability to regain their right to vote.

Finally, my conclusion that the provisions are unconstitutional is only bolstered by the Tennessee Supreme Court's emphasis that the state ex post facto clause is interpreted more broadly than its federal counterpart and that disenfranchisement laws are punitive in nature. In its analysis, the majority fails to acknowledge this fact or the fact that felon disenfranchisement and the ex post facto clause constitute an area of law where the Tennessee Supreme Court plainly has broken ranks with the federal Constitution on previous occasions, *compare May*, 245 S.W.3d at 349, *with Trop v. Dulles*, 356 U.S. 86, 96–97 (1958).

I believe that the Tennessee Supreme Court would deem subsections (b) and (c) of § 40-29-202 to be punitive in nature and that, when retroactively applied, they violate the Tennessee State Constitution's prohibition on ex post facto laws. I would hold likewise and believe that the district court erred in concluding to the contrary.

**II.**

For the reasons stated above, I believe the district court erred in dismissing the claims on the pleadings, and I therefore respectfully dissent.